389 A.2d 1073

PENNSYLVANIA LABOR RELATIONS BOARD, Appellant,

v.

MARS AREA SCHOOL DISTRICT.

Supreme Court of Pennsylvania.

Argued Sept. 23, 1976.

Decided July 19, 1978.

James L. Crawford, Raymond W. Cromer, Asst. Attys. Gen., Pa. Labor Relations Bd., Harrisburg, for appellant.

Charles E. Dillon, Dillon, McCandless, King & Kemper, Butler, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

Appellee Mars Area School District and the Mars Area Association of School Services Personnel, the duly certified bargaining agent of employees of appellee, were parties to a collective bargaining agreement covering the terms and conditions of employment of "teacher-aides," members of the bargaining unit the Association represents. The Association filed with appellant Pennsylvania Labor Relations Board an unfair labor practice charge, alleging appellee violated Sections 1201(a)(1) and 1201(a)(5) of the Public Employe Relations Act (Act 195)[1] by unilaterally terminating the employment of teacher-aides and replacing them with unpaid volunteers. Appellee answered and admitted terminating employment, but contended that its conduct was lawful because it was prompted by economic considerations. After a hearing, the Board found that volunteers

1. Act of July 23, 1970, P.L. 563, 43 P.S. §§ 1101.1201(a)(1) & 1101.-1201(a)(5) (Supp.1978). Sections 1201(a)(1) and 1201(a)(5) provide:
   *"Unfair practices by public employers; acts prohibited*
   (a) Public employers, their agents or representatives are prohibited from:
   (1) Interfering, restraining or coercing employes in the exercise of the rights guaranteed in Article IV of this act.

   \* \* \* \* \* \*

   (5) Refusing to bargain collectively in good faith with an employe representative which is the exclusive representative of employes in an appropriate unit, including but not limited to the discussing of grievances with the exclusive representative."
   The Association further alleged appellee violated Sections 1201(a)(2) and 1201(a)(3) of Act 195, but the Board found the Association did not sustain its burden of proof on these allegations.

were substantially performing the duties of teacher-aides. In its final order, the Board agreed with the Association that appellee's unilateral conduct constituted a refusal to bargain with the Association, in violation of Sections 1201(a)(1) and 1201(a)(5). The Court of Common Pleas of Butler County reversed the final order of the Board. The Board then appealed to the Commonwealth Court, which affirmed. We granted the Board's petition for allowance of appeal and now reverse the Commonwealth Court and reinstate the final order of the Board.[2]

Section 701 of Act 195 provides:

"*Matters subject to bargaining*

Collective bargaining is the performance of the mutual obligation of the public employer and the representative of the public employes to meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment, or the negotiation of an agreement or any question arising thereunder and the execution of a written contract incorporating any agreement reached but such obligation does not compel either party to agree to a proposal or require the making of a concession."

Section 702 provides:

"*Matters not subject to bargaining*

Public employers shall not be required to bargain over matters of inherent managerial policy, which shall include but shall not be limited to such areas of discretion or policy as the functions and programs of the public employer, standards of services, its overall budget, utilization of technology, the organizational structure and selection and direction of personnel. Public employers, however, shall be required to meet and discuss on policy matters affecting wages, hours and terms and conditions of employment as well as the impact thereon upon request by public employe representatives."

2. We hear this appeal pursuant to the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 204(a), 17 P.S. § 211.204(a) (Supp.1978). On May 31, 1978, this case was reassigned to this writer.

Here, the question is whether the Board correctly determined that the dismissal of the Association's teacher-aides and substitution of volunteer workers was a subject of "collective bargaining" within the meaning of Section 701, or one of "inherent managerial policy" within the meaning of Section 702, subject to appellee's unilateral action.

In *Pa.L.R.B. v. State College Area School District*, 461 Pa. 494, 337 A.2d 262 (1975), we were confronted for the first time with Section 701's requirement that public employers bargain collectively with employee representatives "with respect to wages, hours and other terms and conditions of employment" as circumscribed by Section 702's directive that "[p]ublic employers shall not be required to bargain over matters of inherent managerial policy." Mr. Justice Nix, speaking for the Court, summarized the essence of collective bargaining in the public sector:

> "[T]he legislature at the time of the passage of Act 195 fully recognized that the right of collective bargaining was crucial to any attempt to restore harmony in the public sector. It would be absurd to suggest that the legislature deliberately intended to meet this pressing need by providing an illusory right of collective bargaining.
>
>      \*      \*      \*      \*      \*      \*
>
> [Act 195] was a repudiation of the traditional concept of the sanctity of managerial prerogatives in the public sector."

461 Pa. at 504, 506, 337 A.2d at 266, 267. Against this background, this Court fashioned the appropriate test:

> "Thus we hold that where an item of dispute is a matter of fundamental concern to the employes' interest in wages, hours and other terms and conditions of employment, it is not removed as a matter subject to good faith bargaining under section 701 simply because it may touch upon basic policy. It is the duty of the Board in the first instance and the courts thereafter to determine whether the impact of the issue on the interest of the employe in wages, hours and terms and conditions of employment

outweighs its probable effect on the basic policy of the system as a whole."

461 Pa. at 507, 337 A.2d at 268.

We agree with the Board that appellee's unilateral termination of the employment of the Association's teacher-aides and substitution of volunteer workers was impermissible. Appellee's decision deprived the Association's members of work, and thus had an immediate and direct impact upon "a matter of fundamental concern to the employes' interest in wages, hours and other terms and conditions of employment." Id. Appellee's replacement of these members of the Association with volunteers whom the Board found performed the same tasks demonstrates that it did not change its basic policy goals, only the cost of attaining them. The Board properly concluded that the decision's immediate impact on wages, hours, terms, and conditions of employment far outweighs any considerations of managerial policy. Appellee was therefore required to bargain under Section 701. A contrary conclusion would allow the public employer's economic concerns always to outweigh those of its employees, encouraging the very discord in the public sector Act 195 was designed to alleviate.

Our decision upholding the Board is in accord with current authority. Where a school district unilaterally replaced public employees with private employees performing the same functions, the Supreme Court of Wisconsin, interpreting a collective bargaining statute nearly identical to Act 195's, concluded the matter fell within the ambit of collective bargaining:

"The policies and functions of the district are unaffected by the decision. The decision merely substituted private employees for public employees. The same work will be performed in the same places and in the same manner. The services provided by the district will not be affected.

. . .

The primary impact of this decision is on the 'conditions of employment'; the decision is essentially concerned with wages and benefits, and this aspect dominates any element of policy formulation."

*Unified School District v. Wisconsin Empl. Rel'n Comm'n,* 81 Wis.2d 89, 102, 259 N.W.2d 724, 732 (1977). In *Dublin Professional Firefighters v. Valley Community Services Dist.,* 45 Cal.App.3d 116, 119 Cal.Rptr. 182 (1st Dist. 1975), the court, interpreting a similar statute, held that a public agency was obliged to bargain in good faith over assignment of overtime work to temporary employees rather than regular employees previously performing the same work. "The assignment of overtime work to temporary service personnel will have an obvious effect on the workload and compensation of the regular employees, since the regular employees will be deprived of their customary priority in seeking such work." 45 Cal.App.3d at 119, 119 Cal.Rptr. at 183. Cf. *School Committee of Stoughton v. Labor Rel'n Comm'n,* —— Mass.App. ——, 346 N.E.2d 129 (1976) (reducing teacher's aides' hours diluted majority status of union and therefore constituted unfair labor practice).

The Board's order, holding appellee's refusal to bargain an unfair labor charge under Sections 1201(a)(1) and 1201(a)(5), should be reinstated. Section 1201(a)(1) prohibits public employers from "[i]nterfering, restraining or coercing employes in the exercise of the rights guaranteed [under Act 195]." This section closely follows its federal counterpart, 29 U.S.C.A. § 158(a)(1),[3] and was enacted well after the federal courts had established that a refusal to bargain is an unfair labor practice under that section. *N.L.R.B. v. George Groh & Sons,* 329 F.2d 265, 269 (10th Cir. 1964); *Art Metals Construction Co. v. N.L.R.B.,* 110 F.2d 148, 150–51 (2d Cir. 1940) (L. Hand, J.) (based upon legislative history in both Senate and House reports indicating that all other unfair labor practices were "species of the generic unfair labor practice defined in [§ 158(a)(1)]"); CCH Labor Law Rptr. § 3525 at 7633; see *May Department Stores v. N.L.R.B.,* 326 U.S. 376, 383–84, 66 S.Ct. 203, 208, 90 L.Ed. 145 (1946) (semble). We see no reason why this interpretation should

---

**3.** 29 U.S.C.A. § 158(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employes in the exercise of rights guaranteed [under the National Labor Relations Act]."

not equally apply to the comparable language of Section 1201(a)(1) of Act 195.

█ Substantial evidence supports the findings of the Board. Appellee's Superintendent testified to the similarity of the work teacher-aides and volunteers performed:

[By counsel for the dismissed employes:]

Q  Will you enumerate what they did, to the best of your knowledge?

A  You are talking about paid aides?

Q  Yes, sir.

A  Substantially they were in charge of lunchrooms, cafeteria, they assisted and supervised study halls, hall monitoring for supervisory purposes, they acted in a general clerical capacity from typing to correcting tests, running dittos, they assisted in the classroom as directed by the teacher, whether it be a housekeeping chore or in a tutorial role.

\*     \*     \*     \*     \*     \*

Q  What do [the volunteers] do?

A  Basically they are doing clerical functions, running dittos, typing dittos, quasi-tutorial functions, I'd say, in the classroom, the tutoring, under the direction of the teacher.

*Q  They do many of the same things that the paid aides did. Is that correct?*

A  Yes.

Q  The difference being that these people are not paid. Is that correct?

A  One of the differences.

Q  Of course, they do not belong to a bargaining unit and the contract does not apply to them. Is that correct?

A  That's right.

Q  So that in effect what the School District did, Doctor, and correct me if I am wrong, please, is to do away with a complete bargaining unit of eleven people and have volunteers perform the duties that they performed. Is that correct?

A   Partially.

[By counsel for appellee:]

Q   Could you explain that, Doctor, your last answer, "partially."

A   In 1970–71 and '71–'72 when we had volunteer aides and teacher aides simultaneously working in the same building, sometimes in the same classroom, or certainly in the same office, *I couldn't, when I walked in the building, determine the difference of who was a paid aide and who was a volunteer.* Many of the functions, as was pointed out previously, were similar. Some of the people were typing tests for the same teachers and correcting tests for that same teacher, one being a paid aide and one not being a paid aide, *so when Mr. Watzman says that we replaced eleven [paid aides] with volunteers, we did in the fact that they would assume some of the duties, some of the work load that these paid aides did before, the work that they were doing of a similar nature in the preceding year,* so I couldn't say that his statement was completely wrong.

(Emphasis added). One of the dismissed paraprofessionals also testified to the similarity of work.

Although volunteers did not take over each and every duty of the teacher-aides, they performed many of their duties. This evidence supports the finding of the Board that the volunteers substantially replaced the teacher-aides. Therefore, the findings of the Board must be sustained.

Because the refusal of appellee to bargain over the dismissal of teacher-aides was an unfair labor practice under Sections 1201(a)(1) and 1201(a)(5) of Act 195, and because the findings of the Board are supported by substantial evidence in the record, the order of the PLRB must be reinstated.

Orders of the Commonwealth Court and the court of common pleas reversed and final order of the Pennsylvania Labor Relations Board reinstated.

POMEROY, J., filed a concurring and dissenting opinion.

304

JONES, former C. J., did not participate in the decision of this case.

NIX, J., did not participate in the consideration or decision of this case.

POMEROY, Justice, concurring and dissenting.

I agree with the Court, but for reasons that differ somewhat from those given in the majority opinion, that the Mars Area School District should have engaged in collective bargaining as to the termination of employment of the paid teacher aides, and that its failure to do so constituted a violation of Section 1201(a)(5) of the Public Employe Relations Act.[1] ("PERA" or "the Act"). I cannot agree, however, for the reasons explained in part II hereof, that the District by its conduct also transgressed Section 1201(a)(1) of the Act. I would not therefore reinstate the order of the Board as it is written.[2]

## I.

Less than two months before the School District, by unilateral action, terminated the positions of the paid teacher aides the District had recognized the bargaining unit of its employees and their collective bargaining representative, the Association, through the formal process of collective

1. Act of July 23, 1970, P.L. 563, No. 195, art. XII, § 1201(a)(5), 43 P.S. § 1101.1201(a)(5) (Supp.1978).

2. The Pennsylvania Labor Relations Board's "nisi order," issued on June 6, 1973, became the final order of the Board on September 27, 1973. The order directed the School District to do the following:

"1. Cease and desist from, in any manner, interfering, restraining, or coercing its employes in the exercise of the rights guaranteed in Article IV of the Public Employe Relations Act and specifically to cease and desist from preventing employes from engaging in their lawful concerted activities for the purpose of collective bargaining or other mutual aid and protection within the meaning of Section 1201(a)(1) of the Act.

"2. Cease and desist from refusing to bargain collectively with Mars Area Association of School Service Personnel/PSSPA/PSEA over elimination of paid teacher aides and engaging volunteer aides to do their work within the meaning of Section 1201(a)(5) of the Act."

bargaining and the negotiation of a labor agreement. The contract included provisions for the wages, hours and working conditions of the employees covered by the bargaining unit, and was executed, presumably in good faith, on May 8, 1972, reciting an effective date of July 1, 1972. Four days before the effective date of the agreement the School District acted to dismiss the teacher aides.

I believe that where, as here, a public employer negotiates and enters into a collective bargaining agreement the continued existence of positions recognized by the agreement for and during its term may fairly be said to come within the meaning of "terms and conditions of employment" under Section 701 of the PERA, 43 P.S. § 1101.701. While the contract did not specifically guarantee work for any employee, it can only be read to embody a tacit understanding by both parties that the positions which the agreement recognized would, in fact, continue. Indeed, the contract language, while sparse, suggests that it was intended as an extension of the practice with respect to the paid teacher aides program which had obtained in the preceding year.[3] No support for the School District's action can be found in the management rights provision which is silent on any anticipated changes in the use of paraprofessional personnel.[4] In such a situation, it is entirely reasonable to conclude

3. The paid teacher aide program had been commenced during the 1971–72 school year by the hiring of eleven persons whose loss of employment is the occasion of this litigation. Appendix "A" of the labor agreement entered into on May 8, 1972, provided as follows with respect to teacher aides:

"V. *Teacher Aides*

"Teacher aides shall receive an increase of seven percent (7%) in the salary they received in the 1971–72 school year, for 185-day teacher work year as scheduled by the Superintendent for the 1972–73 school year. The teacher aides work day shall consist of seven and one-half (7½) hours as scheduled by the Superintendent."

4. This clause of the agreement (paragraph III) reads as follows:

"Regardless of anything to the contrary contained in this agreement, the employer reserves and retains the sole and exclusive right to determine and administer school policy, to operate and manage the work, and to determine all matters of inherent managerial policy, which shall include but shall not be limited to such

that the security of these positions falls within the language of Section 701 as a bargainable item. This is particularly true where, as here, the employer is uniquely in a position to know or anticipate during the collective bargaining process the need, such as may be caused by budgetary constraints, for immediate further changes of its use of its employees.[5]

What has been said makes it necessary to reject the School District's contention that its decision to terminate the employment here involved fell within the purview of the unilateral decision-making power reserved to management under Section 702 of the PERA, 43 P.S. 1101.702. In striking a balance between the values sought to be conserved by Sections 701 and 702, respectively, of the Act it is necessary, as the opinions in *State College*[6] made clear, to gauge the impact of an issue on the respective interests of employees and employer. In that case I ventured to express the "impact test" for striking a balance between those two sections in terms which differed somewhat from those used in the majority opinion. I suggested that "the factors to be balanced in determining the susceptibility of an item to collective bargaining are the probable effects of the granting or refusal of the item upon (a) the individual performance by the teachers of their duties as such, and upon (b) the

> areas of discretion or policies as the functions and programs of the Employer, standards of services, its overall budget, utilization of technology, the organizational structure and selection and direction of personnel, and the Employer further expressly reserves any and all rights and duties imposed upon it by the School Code or any of the laws of the Commonwealth of Pennsylvania."

5. In January of 1972 the Pennsylvania Department of Education published a document entitled *Guidelines for Program Development, Employment and Utilization of Education Paraprofessionals.* This publication restricted or prohibited the use of paid teacher aides as they were being utilized in the Mars Area School District and indicated that there would have had to be modification of the paid teacher aides program to bring it into conformity with the requirements of the Pennsylvania Department of Education. The School District, however, did not purport to base its termination of the program on the directive of the *Guidelines.*

6. *Pennsylvania Labor Relations Board v. State College Area School District,* 461 Pa. 494, 337 A.2d 262 (1975); *id.* at 461 Pa. 512, 337 A.2d 270 (concurring opinion of Pomeroy, J., joined by Jones, C. J.).

school board's overall operation of an educational system within its district." I further stated that "[i]f the effect of the granting or denial of a request [for bargaining] would be more direct, immediate and substantial upon the teachers' individual performance of their duties than it would be upon the school board's overall operation of an educational system, the item should be considered negotiable." 461 Pa. at 515, 337 A.2d at 272 (concurring opinion of Pomeroy, J.). The *State College* majority would find the issue bargainable if its impact "on the interest of the employee in wages, hours and terms and conditions of employment outweighs its probable effect on the basic policy of the system as a whole." 461 Pa. at 507, 337 A.2d at 268. Whichever formulation be utilized in the case at bar, I am satisfied that the termination of the paid teacher aides, with a resultant savings to the School District of $25,000, or less than one percent of its overall budget, did not affect the "functions and programs", *see* Sec. 702 of the Act, of this particular public employer so as to remove the item from the duty to bargain under Section 701; nor was the determination whether the program could or should be continued, with or without modification, of any major significance to the overall operation of the Mars Area School system in ways other than financial. The termination of the aide positions did, however, have an immediate, direct and drastically adverse effect on the employees involved. I agree, therefore, that the employer's action in terminating the employment of the complainants unilaterally, without bargaining, was in violation of the Act.

## II.

While I agree that the School District was properly held to be in violation of the Act for "[r]efusing to bargain collectively in good faith" *see* the PERA Sec. 1201(a)(5), 43 P.S. 1101.1201(a)(5), I cannot agree that the Board was correct in also finding that the School District was guilty of "[i]nterfering, restraining or coercing employes in the exercise of their rights guaranteed in Article IV of this act." Sec. 1201(a)(1), 43 P.S. 1101.1201(a)(1). Indeed, the record is

barren of any acts of interference, restraint or coercion whatever by the employer in its dealings with the employees. I thus dissent from the Court's direction that the Board's order be reinstated as written.

The majority appears to find justification for the Board's order with respect to § 1201(a)(1) in the Board's finding that the School District replaced the teacher aides with volunteers. As both courts below determined, however, the record does not support this finding. Their conclusion is validated by reference to background information not adverted to in the majority opinion.

It is important to note that the School District's utilization of a volunteer aide program predates the present controversy, having been begun in late 1967 or early 1968. At that time, volunteer aides were assigned to specific teachers. The aides performed tutorial and clerical work under the teachers' supervision, but performed no supervisory functions themselves. During the 1971–72 school year, there were approximately seventy[7] such aides working in the School District on a purely voluntary basis. The volunteers chose their own work schedules and were free to quit any time without notice.

The inception of the paid teacher aide program came about not long before the negotiation of the instant agreement. In 1971 a few persons who formerly worked as part-time cafeteria supervisors were hired as full-time employees and redesignated as teacher aides. Their numbers were increased, the scope of their duties enlarged and the length of the work day extended to seven and one-half hours. As previously stated, in the 1971–72 school year there were eleven paid teacher aides working in the School District. Their supervisory duties consisted of monitoring students on the playground, in the cafeteria, in study hall, in the hallways of the schools, in the libraries, in the busloading areas and during auditorium programs. In addition, the aides performed general clerical work for the professional

7. This number dropped to fifty during the 1972–73 school year.

staff and assisted teachers with tutorial and housekeeping duties in the classrooms.

Following termination of the eleven teacher aide positions there was no "engaging of volunteer aides" to do the work of the paid aides, as the Board erroneously found. Rather, the school district simply continued in effect its five year old policy of using volunteer aides. Thus the record shows that after the complainants were discharged, (1) the volunteer aides continued to do what they had done previously, some of which overlapped with what the paid teacher aides did; (2) some of the tasks performed by the paid teacher aides were taken over by the teachers in accordance with the practice in the School District before the paid teacher aides were hired; and (3) if the tasks of the paid teacher aides were not absorbed by volunteer aides or teachers already on the staff, they were not performed at all. In light of these undisputed facts, it is quite inaccurate to declare, as the Court does, that "volunteers substantially replaced teacher-aides," Opinion of the Court, *ante* at 303, or to suggest that the degree of utilization of volunteers that continued after the discharge of the paid aides was an interference, restraint or coercion of the paid aides in the exercise of their rights.

Although the record does not support a finding that the School District replaced paid teacher aides with volunteers or that the District by any other conduct was in fact guilty of interfering with, restraining or coercing its employees, the majority seems to hold that a violation of Sec. 1201(a)(1) of the Act may nevertheless be found from the refusal to bargain relative to the termination of the paid teacher aide program and positions. *See* Opinion of the Court, *ante* at 1076. But that refusal, all are agreed, is a violation of Sec. 1201(a)(5), "[r]efusing to bargain collectively in good faith". Nothing in the PERA suggests or warrants the conclusion that this failure, without more, is to be deemed also a violation of the entirely separate first clause of § 1201(a), "interfering, restraining or coercing employes." The Court's sole basis for such a tour de force is three totally inapposite federal cases relative to the National Labor Relations Act,

which the Court transports into our interpretative case law pertaining to Pennsylvania's PERA. But as the Court has said in *State College, supra,* our leading case dealing with the problems which inhere in Sections 701 and 702 of the Act, while federal decisions may provide some guidance in view of the linguistic similarities between parts of the NLRA and PERA, "it does not necessarily follow that federal precedent relating to private employment is particularly helpful in resolving difficulties in the public sector." 461 Pa. at 499, 337 A.2d at 264. *See also, Pennsylvania Labor Relations Board v. Employees' Committee of the Wilkinsburg Sanitation Dept.,* 463 Pa. 521, 345 A.2d 641 (1975). It is clear to me that subsection (1) of § 1201(a) of the Act is primarily directed at employer frustration of union organizing efforts rather than at employer refusal to bargain.[8] At any rate, each of the four clauses of Sec. 1201(a) specifies a discrete type of activity which the Act expressly forbids. While in a given case the illegal conduct may offend more than one of the prohibited acts, I see no virtue or warrant, absent some factual basis not present here, in escalating one clear violation, (refusal to bargain), into another violation, (interference, restraint or coercion).

For the above reasons, I dissent from the mandate to reinstate the order of the Board as written. Rather, I would vacate the orders of the Commonwealth Court and the court of common pleas and remand to the Board for the entry of an order consistent with this opinion.

**8.** A finding of a violation of Section 1201(a)(1) necessarily requires a finding of interference with or restraint or coercion of employees in the exercise of their rights guaranteed by Section 401 of PERA, 43 P.S. § 1101.401. That section is the "employe rights" provision of the statute, and provides as follows:

"It shall be lawful for public employes to organize, form, join or assist in employee organizations or to engage in lawful concerted activities for the purpose of collective bargaining or other mutual aid and protection or to bargain collectively through representatives of their own free choice and such employes shall also have the right to refrain from any or all such activities, except as may be required pursuant to a maintenance of membership provision in a collective bargaining agreement."