**AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, DISTRICT COUNCIL 87, Petitioner,**

v.

**PENNSYLVANIA LABOR RELATIONS BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 15, 2013.

Decided Aug. 1, 2013.

---

Amy L. Rosenberger, Philadelphia, for petitioner.

Carolyn M. Sargent, Harrisburg, for respondent.

Robert D. Zaruta, Kingston, for intervenor Luzerne County.

BEFORE: PELLEGRINI, President Judge, and McGINLEY, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and BROBSON, Judge, and McCULLOUGH, Judge.

OPINION BY Judge COHN JUBELIRER.

■ The American Federation of State, County and Municipal Employees, District Council 87 (Union) petitions for review of the Final Order of the Pennsylvania Labor Relations Board (Board) that sustained Luzerne County's (County) exceptions to a Hearing Examiner's Proposed Decision and Order (Proposed Decision). The Board held that the County did not engage in an unfair labor practice in violation of Sections 1201(a)(1) and (a)(5) of the Public Employe Relations Act [1] (PERA) when the Luzerne/Schuylkill Workforce Investment

1. Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. § 1101.1201(a)(1), (5). Sections 1201(a)(1) and (5) of PERA make it an unfair labor practice for a public employer to "interfer[e], restrain[ ], or coerc[e] employes in the exercise of the rights guaranteed in Article IV of [PERA]" or "refus[e] to bargain collectively in good faith with an employe representative which is the exclusive representative of employes in an appropriate unit." 43 P.S. § 1101.1201(a)(1), (5). Public employers must bargain to a bona fide impasse with the exclusive representative of its employees before subcontracting bargaining unit work.

Board (L/S WIB) contracted out bargaining unit work without first bargaining with the Union. The Union argues that the Board's conclusion that no unfair labor practice occurred is incorrect as a matter of law and/or is not supported by the Board's findings of fact. Discerning no error, we affirm.

## I. Statutory and Regulatory Background

The federal Workforce Investment Act of 1998[2] (WIA) provides federal funding for comprehensive workforce development activities. The purpose of the WIA is to increase employment, job retention, and occupational skills of local participants. The WIA requires that, in each local area of a state, a local workforce investment board (WIB) be established to "set policy for the portion of the statewide workforce investment system." Section 117(a) of the WIA, 29 U.S.C. § 2832(a). The WIB's purpose is to increase local employment through the provision of educational and training services, which are paid for by federal funds. In order to obtain federal funding under the WIA, the General Assembly enacted the Workforce Develop-

ment Act[3] (WDA), which, *inter alia,* divided the state into workforce investment areas and created the local WIBs to expend federal funds and create programs to increase employment. Section 504 of the WDA, 24 P.S. § 6250.504.

Under the WIA and WDA, Pennsylvania created the Luzerne/Schuylkill workforce investment area (Area) and the Luzerne County and Schuylkill County chief elected officials designated the L/S WIB[4] as the entity responsible for WIA-funded activities in the Area. The L/S WIB oversees the provision of, *inter alia,* Title I services,[5] as well as Employment Advancement and Retention Network (EARN) services.[6] The County's Workforce Investment Development Agency (County Agency), whose employees are represented by the Union, have been providing the Title I and EARN educational and training services to County residents under the oversight of the L/S WIB. (Proposed Decision, Findings of Fact (Adopted FOF) ¶¶ 3, 5.)

## II. Underlying Dispute

The underlying dispute in this matter arises from the change of providers for

---

*Snyder County Prison Board v. Pennsylvania Labor Relations Board,* 912 A.2d 356, 364, 368 (Pa.Cmwlth.2006).

**2.** 29 U.S.C. §§ 2801–2945.

**3.** Act of December 18, 2001, P.L. 949, *as amended,* 24 P.S. §§ 6250.101–6250.1502.

**4.** The L/S WIB consists of 43 members; 24 members are appointed by Luzerne County, 17 are appointed by Schuylkill County, and 2 are appointed by the Commonwealth of Pennsylvania. (Board Adopted Finding of Fact (Adopted FOF) ¶ 8.) The L/S WIB members are appointed to staggered, fixed terms and are removable only for violating a conflict of interest policy. (Final Order, Amended and Additional Finding of Fact (Amended FOF) ¶ 31.)

**5.** Title I services for adults provide employment and training services for eligible adults

who have lost their job due to downsizing, displacement, or dislocation. (Hr'g Tr. at 54, R.R. at 58a.) Title I youth services are those provided to low-income individuals who meet certain "barrier" criteria, such as "pregnant and parenting youth [or youth with] drug or alcohol" problems. (Hr'g Tr. at 54–55, R.R. at 58a–59a.)

**6.** The EARN program provides employment and training services to individuals who are recipients of Temporary Assistance for Needy Families. (Hr'g Tr. at 55–56, R.R. at 59a–60a.) EARN services are available through the Department of Public Welfare (Public Welfare) and are provided by the L/S WIB pursuant to a contract between the L/S WIB and the Department of Labor and Industry (Labor and Industry).

Title I and EARN services in the Area from the County Agency to third-party private entities as of July 1, 2010. In November 2009,[7] the L/S WIB informed the chief elected officials that it would be issuing Requests for Proposals for the Title I and EARN services.[8] (Final Order, Amended and Additional Findings of Fact (Amended FOF) ¶ 22.) In response to rumors that the County was considering contracting out certain bargaining unit work, the Union, in January 2010, demanded negotiations with the County regarding the potential subcontracting of the work. (Adopted FOF ¶ 20.) After negotiations, the County and Union reached an agreement regarding the positions identified as being at risk of subcontracting by the County. (Adopted FOF ¶ 20.) Neither the negotiations nor the agreement referred to the County Agency positions. (Adopted FOF ¶ 20.) Shortly after the County and Union reached this agreement, the Union heard rumors about subcontracting the County Agency positions, sought a meeting with the County, and demanded negotiations on the potential subcontracting of those positions; the County did not respond to the demand for negotiations. (Adopted FOF ¶¶ 21, 24.)

On March 8, 2010,[9] the L/S WIB issued the Requests for Proposals seeking bids from entities interested in providing Title I and EARN services. (Adopted FOF ¶ 23.) The County Agency submitted proposals, seeking to continue to provide the Title I and EARN services. (Amended FOF ¶ 32.) The L/S WIB initially delayed voting on the submitted proposals, but was told by the Department of Labor and Industry (Labor and Industry), through the County's chief elected official, to pursue the subcontracts and that any change in the plans to subcontract would require an explanation. (Adopted FOF ¶ 26.) The Department of Public Welfare (Public Welfare) also contacted the L/S WIB, advising that it must award the EARN services contract to the contractor that had been selected by the local management committee[10] and that neither the L/S WIB nor the Commissioners of both counties could overturn the local management committee's decision. (Adopted FOF ¶ 27.) Although the Requests for Proposals indicated that the choice of the contractor was subject to the approval of the Luzerne and Schuylkill Counties' Commissioners and the L/S WIB sent a recommendation to the Commissioners, the Commissioners did not act upon the recommendation. (Adopted FOF ¶¶ 25, 28–29.) The County Agency was not one of the recommended

7. On May 12, 2009, Pennsylvania Department of Labor and Industry (Labor and Industry) officials released an audit for the Area that identified deficiencies in the provision of WIA services and required that corrective action be taken. (Adopted FOF ¶ 14.) Although the County Agency established a corrective action plan, it failed to correct all of the deficiencies identified, and Labor and Industry requested that an outline of a plan of corrective action to resolve the problems be created. (Adopted FOF ¶¶ 15–16, 18.) The L/S WIB created the requested outline and sent it to Labor and Industry. (Adopted FOF ¶ 18.)

8. The hearing examiner found that it was the chief elected officials that told the L/S WIB to issue the Requests for Proposals, (Proposed Decision, FOF ¶ 22); however, the Board rejected that finding, which is within the power of the Board to do. (Amended FOF ¶ 22).

9. This finding of fact erroneously refers to the year as "2009." (Adopted FOF ¶ 23.)

10. The local management committee manages the EARN services in a particular area, (Letter from Public Welfare to L/S WIB at 2 (May 12, 2010), R.R. at 740a), and is made up of representatives from the area's local WIA staff, the Bureau of Workforce Development Partnership, educational institutions, and staff from the County Assistance Office. http://www.portal.state.pa.us/portal/server.pt?open=514&objID=554059&mode=2.

contractors. (Amended FOF ¶ 33.) Thereafter, the L/S WIB entered into the contracts, which were between the L/S WIB and third-party contractors, and beginning on July 1, 2010, the Title I and EARN services once provided by the County Agency's employees were being performed by three private companies. (Adopted FOF ¶¶ 29–30.)

### III. Decisions Below

The Union filed an unfair labor practices charge against the County alleging that the County violated Sections 1201(a)(1) and (5) of PERA by unilaterally subcontracting the County Agency work without collective bargaining. The Board's secretary issued a complaint, and hearings were held before the hearing examiner. The hearing examiner issued the Proposed Decision concluding that, because the L/S WIB was controlled by the County, the County committed an unfair labor practice by removing bargaining unit work from the County Agency without bargaining. (Proposed Decision at 9.) To support the finding that the County controlled the L/S WIB, the hearing examiner determined that: it was the chief elected officials who directed the L/S WIB to seek bids for the bargaining unit work; the Requests for Proposals indicated that the Commissioners had to approve the contracts; and under the WIA and WDA, the L/S WIB had to act with the agreement of the chief elected officials in certain matters. (Proposed Decision at 8–9.)

The County filed timely exceptions with the Board. The Board issued its Final Order, which adopted those findings of fact of the Proposed Decision that were consistent with its decision, amended a finding of fact, and added three findings of fact. The Board concluded that the County did not control the L/S WIB, citing, *inter alia*, the facts that: the L/S WIB members do not serve at the pleasure of the chief elected officials; it was the L/S WIB that decided to subcontract the provision of Title I and EARN services; and, under the WIA and WDA, the L/S WIB is solely responsible for identifying eligible providers of the Title I services and entering into contracts with those providers. (Final Order at 7–8.) According to the Board, because the County did not control the L/S WIB, the decision to subcontract the bargaining unit work was made by a third party and did not constitute an unfair labor practice by the County pursuant to *Ellwood City Police Wage and Policy Unit v. Pennsylvania Labor Relations Board*, 731 A.2d 670, 673–74 (Pa.Cmwlth.1999) (holding that where the action complained of being an unfair labor practice was performed by an independent third party, the public employer did not commit an unfair labor practice in violation of PERA). Thus, the Board sustained the County's exceptions, and the Union now petitions this Court for review.[11]

### IV. Arguments and Analysis

The Union argues that the Board's conclusion that the L/S WIB acted independently and outside of the County's control is erroneous because: (1) when the L/S WIB enters into contracts, it does so as an

11. "[W]hen reviewing a decision of the Board, our review is limited to determining whether there has been a violation of constitutional rights, an error of law, [a] procedural irregularity, or whether the findings of the agency are supported by substantial evidence." *Borough of Ellwood City v. Pennsylvania Labor Relations Board*, 606 Pa. 356, 365, 998 A.2d 589, 594 (2010) (citations omitted). "[I]t is well settled that a decision of the Board must be upheld if the Board's factual findings are supported by substantial evidence, and if conclusions of law drawn from those facts are reasonable, not capricious, arbitrary, or illegal." *Id.*

agent of the County; (2) pursuant to the WIA and WDA, the L/S WIB works in partnership with the chief elected officials in the participating counties to develop the Area workforce plan and must obtain approval for its budget from the Commissioners; (3) the Board's interpretation of certain portions of the WIA and WDA to support its decision ignores other provisions that support the Union's position; and (4) the findings of fact and record evidence support the contrary conclusion that the County does control the L/S WIB. In essence, the Union asserts that the County both factually and legally exercises control over the L/S WIB and the decision to subcontract the provision of Title I and EARN services should be imputed to the County.

 Before specifically addressing the Union's arguments, we note some basic principles that guide our examination of the Board's decision. In PERA proceedings, it is the complainant who bears the burden of proving the unfair labor charge. *Lehighton Area School District v. Pennsylvania Labor Relations Board,* 682 A.2d 439, 442 (Pa.Cmwlth.1996). In reviewing a Board determination under PERA, our Court has "recognize[d] that the '[Board] possesses administrative expertise in the area of public employee labor relations and should be shown deference'" and this "'Court will not lightly substitute its judgment for that of the [Board].'" *Id.* (quot-

ing *American Federation of State, County, and Municipal Employees, Council 13, AFL–CIO v. Pennsylvania Labor Relations Board,* 150 Pa.Cmwlth. 642, 616 A.2d 135, 137 (1992)). "It is within the province of the [Board] to weigh conflicting evidence, make appropriate credibility determinations, resolve primary issues of fact and draw reasonable inferences from the established facts and circumstances." *Id.* Applying these principles to the present matter we are, for the following reasons, constrained to affirm the Board's Final Order finding that the Union did not prove that the County had control over the L/S WIB and, consequently, that L/S WIB's decision to subcontract the Title I and EARN services could not be attributed to the County.

The Union contends that, factually, the L/S WIB is the County's agent, is under the County's control, and the Board's conclusions to the contrary are not supported by the record.[12] Here, the Board found that it was the L/S WIB that: decided to subcontract out these services; issued the Requests for Proposals; reviewed the responses; chose the successful bidders; and entered into the contracts, which were between the L/S WIB and the successful bidders. (Adopted FOF ¶¶ 23, 28–29; Amended FOF ¶ 22.) Hence, the Board rejected the contentions that the L/S WIB was an agent for the County and the County controlled the L/S WIB's

---

12. The County argues that it does not control the L/S WIB because the L/S WIB is an incorporated entity that is distinct and autonomous from the County. In 2006, the L/S WIB incorporated as a non-profit corporation whose purpose was to "carry on its functions and responsibilities in accordance with all applicable state and federal policies, rules and regulations related to the [WIA] and the By-Laws of the corporation." (Luzerne/Schuylkill NE 075 Workforce Investment Board, Inc. By–Laws art. III, § 1(A), R.R. at 221a.) Although the WIA and WDA address the cre-

ation of local WIBs, neither statute mentions, authorizes, or prohibits the creation of a non-profit to carry out the functions of the local WIB under the WIA and WDA. Because neither statute expressly addresses the creation of such an entity, a local board's incorporation as a non-profit entity can neither expand nor diminish the local board's authority under the WIA and WDA. We, therefore, will, as the Board did, focus our analysis solely on the authority granted to the L/S WIB under the WIA and WDA.

decision to subcontract the provision of Title I services. The Board's findings are based on the credited testimony of the L/S WIB's executive director and the chairperson of the L/S WIB,[13] (Hr'g Tr. at 48–49, 178, R.R. at 52a–53a, 182a), along with documentary evidence, and, accordingly, are supported by substantial evidence and binding on this Court. *See Allegheny County Deputy Sheriffs' Association v. Pennsylvania Labor Relations Board,* 615 Pa. 126, 131, 41 A.3d 839, 843 (2012) (stating, *inter alia,* that the Board's "decision[s] must be upheld if its factual findings are supported by substantial evidence"). Moreover, the County Agency attempted to retain its contracts, at least one of which it obtained through competitive bidding in 2007, but was not a successful bidder. (Board FOF ¶¶ 32–33.) Finally, we note that, pursuant to Section 117 of the WIA and Section 501(c)(3) of the WDA, the disbursement of the WIA funds is at the direction of the local WIB, not the chief elected official, 29 U.S.C. § 2832(d)(3)(B)(i)(III); 24 P.S. § 6250.501(c)(3), and is required "immediately on receiving such direction from the *local board,"* 29 U.S.C. § 2832(d)(3)(B)(i)(III) (emphasis added). Thus, under the WIA and WDA, the County, through the chief elected official, has no control over the L/S WIB's disbursement of WIA funds for, *inter alia,* the payment of service providers.

The Union's request that this Court revisit or look beyond the Board's supported findings and reinstate the contrary findings of the hearing examiner is beyond the scope of our appellate review. *Borough of Ellwood City v. Pennsylvania Labor Relations Board,* 606 Pa. 356, 365, 998 A.2d 589, 594 (2010) (stating "it is well settled that a decision of the Board must be upheld if the Board's factual findings are supported by substantial evidence"). It is the Board, not the hearing examiner, who is the ultimate fact finder, *Xilas v. Pennsylvania Labor Relations Board,* 65 Pa. Cmwlth. 18, 441 A.2d 513, 515 (1982), and weighing evidence and making credibility determinations are "within the province of the [Board]," *Lehighton Area School District,* 682 A.2d at 442. Similarly, that there is evidence to support findings other than those the Board made or adopted does not alter the result where the Board's findings of fact are supported by substantial evidence in the record. *Mulberry Market, Inc. v. City of Philadelphia, Board of License & Inspection Review,* 735 A.2d 761, 767 (Pa.Cmwlth.1999). Accordingly, we find no error in the Board's factual conclusions that the L/S WIB is not controlled by the County and independently decided to subcontract Title I and EARN services.

The Union next contends that, pursuant to certain provisions of the WIA and WDA, the County legally controls the L/S WIB and the Board erred in citing other provisions to support its contrary determination. To support its position, the Union relies upon language in the WIA and WDA that the local WIB is "to advise and assist" the counties they serve by "setting policy to promote effective workforce investment

13. The executive director testified that, at "informative meetings ... both sets of Commissioners were informed [that the L/S WIB would be seeking competitive bids] and there was concurrence" and that, at a November 18, 2009 meeting, the information related to the L/S WIB seeking competitive bids "was shared with both County Commissioners." (Hr'g Tr. at 48–49, R.R. at 52a–53a.) The chairperson of the L/S WIB stated that it was the L/S WIB that decided to competitively bid WIA Services in the Area, the County Commissioners did not tell the L/S WIB to engage in competitive bidding for those services, and the L/S WIB did not obtain approval from the County Commissioners before issuing the Requests for Proposals. (Hr'g Tr. at 178, R.R. at 182a.)

programs." Section 501(b) of the WDA, 24 P.S. § 6250.501(b). It also cites WIA and WDA provisions indicating that the local WIB is to work with "the chief elected official" in the Area to submit the local plan to the Governor, select providers for Title I services, and develop a budget to support its position. Sections 117 and 118 of the WIA, 29 U.S.C. §§ 2832(d), 2833(a); 24 P.S. § 6250.504. Finally, the Union points to the fact that the County and Schuylkill County are the signatories for the WIA funds. and designate the fiscal agent for the WIA funds.

There is no dispute that, under the WIA and WDA, the chief elected official participates, to some degree, in the operation of a local WIB. The local WIB partners with the chief elected official to create a local plan, which is then submitted to the Governor for approval, and the chief elected official approves the local WIB budget.[14] 29 U.S.C. § 2832(d)(1), (d)(3)(A). However, the fact that the WIA and WDA recognize the importance of having the local WIB working with local officials to determine the needs of the local workforce investment area and to set the policy for that area does not mean that the local official *controls* the local WIB. The approval of the local budget is subject to the specific allotment criteria for Title I services set forth in the WIA and corresponding federal regulations. Sections 133 and 134 of the WIA, 29 U.S.C. §§ 2863–2864; 20 C.F.R. § 663.145(a); 24 P.S. § 6250.504. Thus, although the chief elected official

must "approve" the budget, the allocation of the funds received is primarily based on the formulas set forth in the WIA. More importantly, notwithstanding the fact that the chief elected official is the signatory for the federal funds, both the WIA and the WDA specifically provide that the *disbursement of the WIA funds is at the direction of the local WIB, not the chief elected official.* 29 U.S.C. § 2832(d)(3)(B)(i)(I)-(III); 24 P.S. § 6250.501(c)(3). In fact, the WIA states that the disbursement must occur "immediately on receiving such direction from the *local board.*" 29 U.S.C. § 2832(d)(3)(B)(i)(III) (emphasis added). Accordingly, the provisions cited by the Union do not, in this Court's opinion, support the overall conclusion that the County controls the L/S WIB and that the Board erred in holding otherwise.

With regard to the identification and selection of eligible service providers for Title I services, the Board determined that the L/S WIB is the entity solely responsible for making these decisions under the WIA and WDA. (Final Order at 8.) The statutory provisions of the WIA and WDA support the Board's determination. The identification and selection of eligible service providers, particularly the Intensive Services and Youth Services at issue here, is *specifically* granted by federal and state law to the local WIB without *any* reference to the approval or agreement of the chief elected official or participating counties.[15] Sections 117(d)(2)(B), 123, and 134

14. In conjunction with developing the local plan, the local WIB, chief elected official, and the Governor negotiate the local levels of performance for the local workforce investment area, as described in Section 136(c) of the WIA, 29 U.S.C. § 2871(c), which are to be used *"by the local board* for measuring the performance of the local fiscal agent (where appropriate), eligible providers, and the one-stop delivery system, in the local area." 29

U.S.C. § 2833(b)(3) (emphasis added); *see also* 20 C.F.R. §§ 663.510(d), (e), .515, .535 (setting forth the local board's responsibilities in managing the eligible provider process). Thus, it is the local WIB, not the chief elected official or participating county, that is responsible for monitoring the performance of those entities providing WIA services.

15. The WIA, and the regulations promulgated thereunder, provide only two instances where

of the WIA, 29 U.S.C. §§ 2832(d)(2)(B), 2843, 2864(d)(3)(B); 20 C.F.R. §§ 663.100(b)(2), 663.145(a), 663.210(a); Section 504(b)(7)(ii)(B) of the WDA, 24 P.S. § 6250.504(b)(7)(ii)(B).[16] There is no evidence that the identification and selection of eligible service providers is being done in a manner contrary to that provided for in the WIA. Because under these provisions the local WIB, not the county, has the sole authority to identify and choose providers, the Board's conclusion that the County did not control the L/S WIB's decision to subcontract the Title I services was not erroneous.

For the foregoing reasons, the Board did not err in concluding that the County did not commit an unfair labor practice with regard to the subcontracting of the Title I services provided under the WIA and WDA.

■ Our analysis does not end here, however, because we must separately address whether the L/S WIB's subcontracting of the EARN services constituted an unfair labor practice on the County's part. Labor and Industry contracts with the L/S WIB to provide the EARN Services for county citizens who receive Temporary Assistance for Needy Families from Public Welfare. (Letter from Public Welfare to L/S WIB (May 12, 2010), R.R. at 739a–40a; Hr'g Tr. at 54–56, R.R. at 58a–60a.) Pursuant to a May 12, 2010 letter from Public Welfare to the L/S WIB (Letter), which contains excerpts from the Workforce Development Grant Agreement between Labor and Industry and the L/S WIB, along with the Master Guidelines, which create and govern the local management committees and EARN services, Public Welfare reiterated that the local management committee is the entity that chooses the EARN services providers. (Letter from Public Welfare to L/S WIB at 1 (May 12, 2010), R.R. at 739a.) This Letter further provides that the L/S·WIB is contractually bound to follow the Master Guidelines, which specifically state that "[a] properly completed bid process cannot be overturned by the WIB or local elected officials." (Letter from Public Welfare to L/S WIB at 1 (May 12, 2010), R.R. at 739a (citation omitted).) According to the Letter, the local management committee: au-

---

a local WIB must select a provider "with the agreement of the chief elected official," which is the selection of One–Stop operators, 29 U.S.C. § 2832(d)(2)(A), 20 C.F.R. § 661.305(2), and where the local WIB, itself, would be providing certain WIA services, 29 U.S.C. § 2832(f)(2). In the latter instance, the Governor also would have to approve the local WIB's provision of the services. *Id.* The present situation does not fall into either of these circumstances. However, we note that once a One–Stop operator is chosen, the memorandum of understanding is "between the *Local Board* and each of the One–Stop partners concerning the operation of the local One–Stop delivery system." 20 C.F.R. § 661.350(a)(3)(ii) (emphasis added).

16. For example, Section 117(d)(2) of the WIA describes the functions of the local WIB, which include: the selection of youth providers, a process that requires the local WIB to identify eligible providers "by awarding grants or contracts on a competitive basis"; identifying providers of training services; and identifying providers of intensive services as described in Section 134(d)(3) of the WIA. 29 U.S.C. § 2832(d)(2)(B)-(D). Section 134(d)(3) of the WIA provides that intensive services should be provided either by One–Stop operators or "through contracts with service providers, which may include contracts with public, private for-profit, and private nonprofit service providers, *approved by the local board.*" 29 U.S.C. § 2864(d)(3)(B) (emphasis added); *see also* 24 P.S. § 6250.504(b)(7)(ii)(B) (authorizing the local WIB to use WIA funds to provide intensive services through One–Stop operators or "through contracts with service providers, which may include contracts with public, private for-profit and private nonprofit service providers, approved by the local workforce investment board.")

thorized the L/S WIB to issue a Request for Proposal for EARN services on its behalf; received and reviewed bids using an objective scoring method; and selected a vendor to provide EARN services. (Letter from Public Welfare to L/S WIB at 2 (May 12, 2010), R.R. at 740a.) Citing the Workforce Development Grant Agreement, the Letter warned that if the L/S WIB did not enter into a contract with the vendor the local management committee chose, the "Department reserve[d] the right to unilaterally terminate [the] grant within 30 days written notice." (Letter from Public Welfare to L/S WIB at 2 (May 12, 2010), R.R. at 740a (citation omitted); Workforce Development Grant Agreement at 4, R.R. at 732a.) Because EARN services are not governed by the WIA and WDA, but by a contract between the L/S WIB and Labor and Industry, which provides that the local management committee, not the L/S WIB or the County, has control over choosing vendors, the subcontracting of those services did not constitute an unfair labor practice in violation of PERA by the County.

## V. Conclusion

There is substantial evidence to support the Board's conclusion that the County did not control the L/S WIB's decision to subcontract the County Agency work and we will not substitute our judgment for that of the Board. Absent the County's control,

the actions of the L/S WIB, an independent third party not subject to the collective bargaining agreement, are not attributable to the County and do not constitute an unfair labor practice under Section 1201(a)(2) and (a)(5) of PERA. *Ellwood City Police Wage and Policy Unit*, 731 A.2d at 673–74. Accordingly, the Board's Final Order is affirmed.

## ORDER

**NOW**, August 1, 2013, the Order of the Pennsylvania Labor Relations Board entered in the above-captioned matter is hereby **AFFIRMED.**

DISSENTING OPINION BY President Judge PELLEGRINI.

Unlike the majority, I would hold that the Pennsylvania Labor Relations Board (Board) erred in not finding that Luzerne County (County) committed an unfair labor practice in violation of Sections 1201(a)(1) and (a)(5) of the Public Employe Relations Act (Act)[1] by not negotiating to a bona fide impasse[2] with the American Federation of State, County, and Municipal Employees, District Council 87 (Union) before contracting out workforce development activities.

Agreeing with the Board's finding that the County did not commit an unfair labor practice by failing to bargain,[3] notwith-

---

1. Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. § 1101.1201(a). Section 1201(a) of the Act provides, in relevant part:

 (a) Public employers, their agents or representatives are prohibited from:
 (1) Interfering, restraining or coercing employes in the exercise of the rights guaranteed in Article IV of this act.

 * * *

 (5) Refusing to bargain collectively in good faith with an employe representative which is the exclusive representative of employes in an appropriate unit, including but

not limited to the discussing of grievances with the exclusive representative.

2. *See Pennsylvania Labor Relations Board v. Mars Area School District*, 480 Pa. 295, 389 A.2d 1073 (1978); *Snyder County Prison Board v. Pennsylvania Labor Relations Board*, 912 A.2d 356 (Pa.Cmwlth.2006), *appeal denied*, 593 Pa. 730, 928 A.2d 1292 (2007).

3. The Board did not adopt the hearing examiner's proposed decision and order that would have found that the County committed an unfair labor practice because the requests for

standing that workforce investment board (WIB) requests for proposals to provide services which were sought to be contracted out stated that WIB's choice of contractor was subject to the approval of the Board of Commissioners (Commissioners), the majority finds that the County does not have to bargain with the Union because the WIB is some sort of independent government entity, separate and apart from county government that is not beholden to county elected officials or its citizens for the expenditure of public funds. In arriving at its conclusion and ignoring the rest of the provisions of the Pennsylvania Workforce Development Act (PWDA),[4] it finds that just because the WIB "identifies and selects" providers, it is somehow not part of county government.

I disagree with the majority because (1) under the PWDA, a WIB is part of county government; (2) under the uncontroverted facts, the County had functional control over the Luzerne/Schuylkill Workforce Investment Board (L/S WIB); and (3) even if you agree with the majority, the L/S WIB does not have a separate legal structure and must bargain over whether work should be contracted out.

## I.

L/S WIB's legal status *vis-a-vis* the County is set forth in Section 502 of the PWDA, which provides that members of the Board are appointed in "accordance with the criteria established by the board for the Governor ... by the chief elected official[s] of the city, county or counties that participate in the local workforce investment board ..." 24 P.S. § 6250.502(b). This provision is silent on the length and term of the members' service or whether they serve at will.

The purpose of each local workforce investment board is "to **advise and assist** the chief elected official in the county or counties served by the local workforce investment board by setting policy to promote effective workforce investment programs in a designated geographic area." Section 501(b) of the PWDA, 24 P.S. § 6250.501(b) (emphasis added). The PWDA provides that the workforce investment board is to work with "the chief elected official" in the area to submit a local plan to the governor, select providers for certain services, develop a budget for the workforce investment board, and oversee local youth programs and employment and training activities. Section 504 of the PWDA, 24 P.S. § 6250.504. *See also* Section 101 of the Workforce Investment Act of 1998(WIA), 29 U.S.C. § 2801. The local WIB advises and assists the chief elected official to create a local plan, which is then submitted to the Governor for approval, and the chief elected official approves the local WIB budget.[5] Once the funds come

---

proposals, press releases and the Workforce Investment Act (WIA) Chief Elected Official Agreement all discussed cooperation between the WIB and the Commissioners, and the requests also contained language requiring Commissioner approval before contracts could be awarded. The hearing examiner found that the County could not claim that the Luzerne/Schuylkill WIB's decision was beyond its control. The hearing examiner, therefore, proposed that the County be ordered to rescind the contracts for Title I and EARN programs and return that work to the agency. Because while the Board is free to

find facts differently, the facts the hearing examiner used in arriving at his conclusion are undisputed. I believe those facts establish that the County was in complete control of the decision to contract out the work.

4. Act of December 18, 2001, P.L. 949, *as amended,* 24 P.S. §§ 6250.101–6250.1502.

5. In conjunction with developing the local plan, the local WIB, chief elected official and the Governor negotiate the local levels of performance for the local workforce investment area as described in Section 136(c) of the

into the county treasury, they can only be disbursed in accordance with the statutorily prescribed procedures. *See Shapp v. Sloan*, 480 Pa. 449, 391 A.2d 595 (1978).

Ignoring that the "purpose" of the WIB is to "advise and assist" or the other provisions placing the matter within county control, the majority finds the fact that the WIA and PWDA "recognize the importance of having the *local* WIB working with *local* officials to determine the needs of the *local* workforce investment area and to set the policy for that area does not mean that the local official *controls* the local WIB." *American Federation of State, County and Municipal Employees, District Council 87 v. Pennsylvania Labor Relations Board*, 77 A.3d 53, 60 (No. 929 C.D.2012, filed August 1, 2013), 2013 WL 3943266 (emphasis in original). It arrives at that conclusion for one simple reason— the disbursement of the WIA funds is at the direction of the local WIB, not the chief elected official. 29 U.S.C. § 2832(d)(3)(B)(i)(I)-(III); 24 P.S. § 6250.501(c)(3).

While a workforce investment board has the authority "[t]o authorize use of local workforce investment funds," 24 P.S. § 6250.504(b)(7), and identify and select eligible service providers, what that argument ignores is that the WIB has no authority to enter into a contract that would itself authorize the funds to be disbursed. The contract itself would have to be entered into by the county with local checks and balances such as including the normally required contract provisions, *e.g.*, antidiscrimination provisions; having the provisions properly identify the scope of the

work; making sure that funds for which disbursement is sought are available for encumbrance; and seeing if the funds authorized are for a proper WIB activity. Also, the PWDA envisions that the contracting authority remains in the county because the chief elected official of the local government, *i.e.*, the county's taxpayers, is responsible for "any misuse of the grant funds allocated to the local workforce investment area ..." 24 P.S. § 6250.501(c).

Not only is the purpose of the WIB to "advise and assist" the county's chief elected officer; the county is responsible for signing for the funds, approving the budgeting of the funds and for misuse of the funds. All of the above establishes that the WIB is intertwined with and housed within the county governmental structure.

## II.

Regardless of how one interprets the WIB's status under the PWDA, based on the uncontroverted facts of record, the County had control over the decision to bid out the work. It is undisputed that in November 2009, the chairperson of the Commissioners, unbeknownst to the Union, decided that the L/S WIB should seek competitive bids for all of its programs. In March 2010, the L/S WIB issued requests for proposals to provide services for Title I and EARN programs, and each of the requests indicated that WIB's choice of contractor was subject to the approval of the Commissioners. The County also issued a press release stating that the Commissioners had to approve the contracts.

---

WIA, 29 U.S.C. § 2871(c), which are to be used *"by the local board* for measuring the performance of the local fiscal agent (where appropriate), eligible providers, and the one-stop delivery system, in the local area." 29 U.S.C. § 2833(b)(3) (emphasis added). *See also* 20 C.F.R. §§ 663.510(d), (e), .515, .535

(setting forth the local board's responsibilities in managing the eligible provider process). Thus, it is the local WIB and not the chief elected official or participating county that is responsible for monitoring the performance of those entities providing WIA services.

Based on these uncontroverted facts, I would hold that the County had control over the decision to contract out the work.

## III.

While I would hold that the L/S WIB under PWDA is part of county government and/or that it has functional control over it, like the majority, I would reject the County's position that the L/S WIB is not its agent because it was transformed from a governmental board to a non-profit corporation with a nonmembership model. Unlike the majority, I would hold that because a non-profit took over those functions, there has been no decision by the L/S WIB to contract out the work.

Under Article III, Section 1(A) of the non-profit's by-laws, it purportedly assumes the L/S WIB's powers. It provides:

The business and affairs of the L/S WIB shall be managed by or under the direction of the Board of Directors. The Board of Directors will undertake and carry out the functions and responsibilities in accordance with the applicable state and federal policies, rules and regulations related to the Workforce Investment Act of 1998 and the By–Laws of the corporation.

(Joint Exhibit 2 at 4.) The County contends that L/S WIB cannot be a County agency because it is an autonomous, non-profit corporation, and the County has no power to interfere in its operation.

The majority rejects the argument that the County can create a non-profit to carry out the L/S WIB function, stating that "[b]ecause neither statute expressly addresses the creation of such an entity, a local board's incorporation as a non-profit entity can neither expand nor diminish the local board's authority under the WIA and WDA." *American Federation of State, County and Municipal Employees, District Council 87 v. Pennsylvania Labor Relations Board*, 77 A.3d 53, 58 n. 12 (No. 929 C.D.2012, filed August 1, 2013), 2013 WL 3943266. It then went on to state "[w]e, therefore, will, as the Board did, focus our analysis solely on the authority granted to the L/S WIB under the WIA and WDA." *Id.* After making that analysis, the majority found that because the L/S WIB was not apart and free from control from the County government, it had no obligation to negotiate with the Union over contracting out work, a conclusion with which, as I explained earlier, I disagree. However, the resolution of that issue is not necessarily determinative in this case.

As the majority points out, nothing in either the WIA or the PWDA mentions the creation of a non-profit corporation to carry out the functions of the WIB; under both Acts, only the WIB was entrusted to carry out the functions set forth in both Acts. This is understandable because the General Assembly could not do so even if it wanted, as the Pennsylvania Constitution provides that "[t]he General Assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever." Pa. Const. art. III, § 31.

This provision embodies the principle that the purpose of a democracy is to live democratically. In a democracy, citizens elect individuals to make those decisions and every so often they can throw them out of office if they do not serve the public will. When we compromise those principles by "outsourcing," such as creating a non-profit corporation to carry out functions entrusted to a public body in order to

achieve some other "good,"[6] we weaken the democracy by not letting citizens through their elected representatives decide what is in the public interest.

For those reasons, I agree with the majority that using the non-profit corporation to carry out WIB functions is impermissible. However, that if you agree with the majority conclusion that a WIB Board under PWDA is some sort of free-floating governmental agency outside the structure of county government that can decide to contract out work, L/S WIB still has to make the determination. The L/S WIB did not do so here because it does not exist. It has been supplanted by the non-profit corporation which does not have the authority to undertake governmental action.

Because I would hold that L/S WIB is part of the County and the County determines how services are delivered, the County committed an unfair labor practice by failing to bargain with the Union before subcontracting work.

Judge McGINLEY joins in this dissenting opinion.

---

**6.** Usually, when this provision and provisions like it are "compromised," it is because it is more expeditious to do so, *i.e.*, it is easier to get something done without the hassle of applying pesky governmental laws such as bonding or insurance or, for that matter, public accountability. Another reason given is "let's get the politics out of it" which usually means "let's get the public out of it."