**[J-83-2014]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, MCCAFFERY, STEVENS, JJ.**

| | | |
|---|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, DISTRICT COUNCIL 87, | : : : : | No. 11 MAP 2014 |
| | : | Appeal from the Order of the |
| Appellant | : : | Commonwealth Court at No. 929 CD 2012 dated 8/1/13 which affirmed the |
| | : | order from the Pennsylvania Labor |
| v. | : : | Relations Board at No. PERA-C-10-185-E dated 4/17/12 |
| PENNSYLVANIA LABOR RELATIONS BOARD, | : : : | |
| | : | |
| Appellee | : : | |
| | : | |
| LUZERNE COUNTY, | : : | |
| Intervenor | : | ARGUED: October 7, 2014 |

**OPINION**

**MR. CHIEF JUSTICE SAYLOR**               **DECIDED: March 25, 2015**

This discretionary appeal addresses whether a county was required to bargain collectively with a union representing county employees before a local workforce investment board could seek competitive bids for the provision of workforce development services previously provided by the county employees. The primary issue is whether the local board acted as the county's agent when it sought bids and contracted with private entities for the services in question.

In 1998 Congress passed the Workforce Investment Act (the "WIA"),[1] a portion of which pertains to the establishment and functioning of state and local workforce

---

[1] Pub. L. No. 105-220, 112 Stat. 936 (as amended 29 U.S.C. §§2801-2945).

investment systems. *See* 29 U.S.C. §§2811-2872. The WIA allocates funds for distribution to state and local workforce investment boards with the goal of improving the quality of the workforce, increasing participants' employment, retention, and earnings, and reducing welfare dependency. *See* 29 U.S.C. §2811; 81 C.J.S. *Soc. Sec. & Pub. Welfare* §32 (2014). *See generally Richards v. City of Lowell*, 472 F. Supp. 2d 51, 58 (D. Mass. 2007); 10 HR ADVISOR: LEGAL & PRACTICAL GUIDANCE Issue 3 (2004).

Pursuant to the WIA and its state counterpart, the Workforce Development Act (the "WDA"),[2] Pennsylvania is divided into a number of geographic regions known as workforce investment areas, each overseen by a local workforce investment board. *See* 29 U.S.C. §§2831-2833; 24 P.S. §§6250.501-6250.505.[3] These local boards are tasked with setting policy and establishing workforce development services in their geographic region in collaboration with various educational institutions. *See* 24 P.S. §6250.501. The majority of the local boards' membership consists of individuals engaged in private business. The remaining members are drawn from such entities as local educational institutions, economic development organizations, community-based groups, and labor organizations. *See* 24 P.S. §6250.502(a)(1). Under the WDA, all local board members should be "individuals who have optimum policymaking authority within the organizations, agencies or other entities which they represent." 24 P.S. §6250.502(a)(2).

---

[2] Act of Dec. 18, 2001, P.L. 949, No. 114 (as amended 24 P.S. §§6250.101-6250.1502).

[3] Workforce investment areas are designated by the Governor through consultation with the Pennsylvania Workforce Investment Board, *see* 24 P.S. §6250.301, and the chief elected official of each locality. *See id.* §6250.501(a). Except in home-rule counties and first- and second-class cities, the chief elected official is the chairperson of a county board of commissioners. *See id.* §6250.103 (defining terms). At all relevant times, Luzerne County was not a home-rule county.

The geographic area consisting of Luzerne County (the "County") and Schuylkill County has been designated as the Luzerne/Schuylkill Workforce Investment Area, also termed the NE075 local workforce investment area.  To serve this area, the Luzerne/ Schuylkill Workforce Investment Board (the "Local Board") was incorporated in 2006 as a Pennsylvania nonprofit corporation.  The Local Board consists of 43 members, 24 appointed by the Luzerne County Commissioners, 17 appointed by the Schuylkill County Commissioners, and two appointed by the Commonwealth.  The members are appointed to staggered, fixed terms and can only be removed for conflicts of interest. *See* 29 U.S.C. §2832(g); 24 P.S. §6250.503.  The Local Board oversees federally-funded services to residents of Luzerne and Schuylkill Counties under Title I of the WIA, including adult and dislocated worker services, as well as youth programs (the "Title I programs").[4]  The Local Board also acts as the conduit to provide services on behalf of the Department of Public Welfare ("DPW"), which include Employment Advancement and Retention Network ("EARN") services.[5]

---

[4] Title I programs include employment and training services for adults who have lost their jobs due to downsizing, displacement, or dislocation.  These programs also provide services to low-income youth such as pregnant or parenting youth, or youth with drug or alcohol problems.  *See* 29 U.S.C. §2854; *AFSCME, Dist. Council 87 v. Luzerne Cnty.*, 77 A.3d 53, 55 n.5 (Pa. Cmwlth. 2013).

[5] EARN services are funded through DPW to provide employment and training assistance to individuals receiving TANF (Temporary Assistance for Needy Families) benefits.  Although funded by DPW, the services are provided pursuant to a contract between the Local Board and the Department of Labor and Industry, albeit in conformance with DPW's "Master Guidelines" on the topic.  A local management committee ("LMC") oversees, manages, and directs EARN services provided in the County.  The LMC is comprised of representatives from the County Assistance Office, L&I's Bureau of Workforce Development Partnership, a local education agency, an economic development agency, and the Local Board.  *See* Joint Exh. 6, R.R. 374a.

In 2007, after competitive bidding, the Local Board awarded a contract to the County's Workforce Investment Development Agency (the "County Agency") to provide Title I youth services in the County until June 30, 2010. The County Agency employed 39 individuals who carried out the agency's duties under the contract and provided other Title I and EARN services. Such individuals are part of the residual bargaining unit of Luzerne County employees, which is exclusively represented by Appellant, the American Federation of State, County and Municipal Employees, District Council 87 (the "Union"). The Union maintains a collective bargaining agreement with the County (the "CBA"); the CBA in force between the Union and the County at all relevant times was finalized in September 2009. During CBA negotiations, the County did not propose any language concerning the contracting-out of residual bargaining unit work. The Local Board, which contracted out the work in question, is not a party to the CBA.

In May 2009 the Pennsylvania Department of Labor and Industry ("L&I") released a performance audit for NE075, identifying thirteen deficiencies with regard to the provision of Title I and EARN services and requiring a corrective plan. At that time the County Agency's executive director was acting as fiscal agent for NE075. He submitted a corrective plan; however, it did not cure all deficiencies. In November 2009, Maryanne Petrilla, Chair of the Luzerne County Board of Commissioners, transferred fiscal agent status to the Local Board and made the Board the recipient of WIA funds. The Local Board eventually submitted to L&I a plan of corrective actions to remedy any outstanding problems.[6]

At some point in November 2009 after becoming fiscal agent for NE075, the Local Board met with Ms. Petrilla, as well as her counterpart from Schuylkill County, and

---

[6] Ms. Petrilla explained that the Governor and other state-level officials were threatening to withhold funding if the County continued to allow the fiscal agent to be the same as the entity performing the work. *See* N.T., Sept. 23, 2010, at 144-47, R.R. 148a-151a.

informed them that it had decided to seek competitive bids for all Title I and EARN programs then being handled by the County Agency. The chairpersons concurred with this decision. Several months later, in March 2010, the Local Board issued requests for proposals ("RFPs"), seeking bids from parties interested in providing Title I and EARN services beginning July 1, 2010. The Union wrote to the County demanding that it engage in collective bargaining over any proposed contracting-out of its bargaining unit work, but the County did not respond.

The Local Board's RFPs indicated that its choice of contractor(s) would be subject to approval by the County. The County Agency submitted a bid in an effort to continue providing workforce development services. However, the Local Board did not select the County Agency's bid and instead awarded contracts to three private entities.

Consistent with the RFPs' representation concerning County approval, the Local Board submitted its choice of the three companies to the County, terming it a recommendation. The County, however, never acted on the submission. Chairperson Petrilla testified that, although she and the other County Commissioners were upset over the County Agency losing the work, they had been advised by the County solicitor that the Local Board could make the decision autonomously and that the Commissioners had no authority to vote on the selection of a provider. Likewise, the Local Board was advised by its attorney that County approval was unnecessary. Thus, the Local Board entered into contracts with the providers without receiving any input from the County.[7] These companies began providing Title I and EARN services on July 1, 2010, at which time the County Agency's employees were discharged.

---

[7] Initially, the Local Board delayed notifying the selected providers of the awards. This prompted DPW to send a warning letter to the Local Board portraying the Local Board's action in requesting competitive bids (at least for the EARN services) as having been undertaken at the LMC's direction, and indicating that the providers were, in fact, (continued…)

Meanwhile, in late May 2010, the Union filed a charge of unfair labor practices with the Pennsylvania Labor Relations Board (the "PLRB"), alleging that the County had violated Sections 1201(a)(1) and (5) of the Public Employe Relations Act ("PERA").[8] *See* 43 P.S. §§1101.1201(a)(1), (5).  Subsection (a)(1) precludes public employers from interfering, restraining, or coercing employees in the exercise of their PERA rights, *see id.* §1101.401 (relating to employee rights), and subsection (a)(5) prohibits public employers from refusing to bargain collectively in good faith with the exclusive representative of employees in a particular bargaining unit.  *See id.* §1101.1201(a)(5).

Under prevailing Pennsylvania law, subsection (a)(5)'s good-faith bargaining requirement has been understood to mean that a public employer must bargain to a *bona fide* impasse before moving bargaining-unit work to a private contractor.  *See Snyder Cnty. Prison Bd. v. PLRB*, 912 A.2d 356, 364 (Pa. Cmwlth. 2006); *cf. PLRB v. Mars Area Sch. Dist.*, 480 Pa. 295, 389 A.2d 1073 (1978) (holding that a school district violated PERA by firing its teacher aides and replacing them with volunteers without first bargaining with the teacher aides' bargaining agent).  Thus, the Union alleged that, by issuing RFPs and unilaterally contracting out the Title I and EARN work without first engaging in collective bargaining, the County violated this provision and more generally "interfered, restrained, and coerced employees in the exercise of their rights" under

---

(…continued)
selected by the LMC.  The letter admonished that, under DPW's Master Guidelines, *see supra* note 5, the Local Board was obligated to enter into timely contracts on behalf of the LMC with the selected EARN providers on pain of termination of the grant monies. *See* Letter of May 12, 2010, County Exh. 2, R.R. 760a-761a.  The Local Board complied shortly thereafter by sending award letters and entering into the contracts.

[8] Act of July 23, 1970, P.L. 563 (as amended 43 P.S. §§1101.101 - 1101.2301).  No unfair labor charge was filed against Schuylkill County because its workforce development services were not being provided by unionized workers.

PERA. Charge of Unfair Practice(s) under PERA at 2, R.R. 4a. Although the Local Board, rather than the County, had taken these actions, the Union argued that the Local Board was acting as the County's agent, and hence, the County could be held responsible for any failure to bargain with the Union.

An evidentiary hearing was held at which numerous witnesses testified and the parties introduced exhibits. The hearing examiner issued a proposed decision and order, suggesting that the County retained control over the decision to contract out the work and, therefore, it was required to bargain with the Union. The hearing examiner concluded that, by failing to do so, the County had committed an unfair labor practice as alleged by the Union. The proposed order directed the County to rescind the July 1, 2010, contracts, return all of the work to the County Agency, and make the agency's employees whole for lost wages and benefits.

The County filed exceptions claiming, *inter alia*, that: the Local Board is an autonomous, non-profit corporation which is independent of the County; under the WIA and the WDA the Local Board is the fiscal agent for Title I and EARN services and, as such, has sole responsibility to implement those services by expending funds and awarding contracts; and the County has no authority to rescind or otherwise interfere with the July 2010 contracts because it is not a party to those contracts.

The PLRB issued a Final Order, sustaining the County's exceptions and concluding that the County did not control the Local Board. The PLRB, as the ultimate finder of fact, *see* 43 P.S. §211.8(c); *Xilas v. PLRB*, 65 Pa. Cmwlth. 18, 22, 441 A.2d 513, 515 (1982), found that the hearing examiner had erred in several respects with regard to the Local Board's role vis-à-vis the County. In particular, the PLRB determined that the hearing examiner had improperly stated that the Local Board only acted in an advisory or assistive capacity relative to the County Commissioners.

Rather, based on the facts of record and the statutory law – specifically, the WIA and the WDA – the PLRB concluded that the Local Board was solely responsible for identifying eligible providers and entering into contracts with them. Moreover, the PLRB noted that the WIA affirmatively requires competitive bidding for a category of Title I service, namely, those pertaining to in-school and out-of-school youth. *See AFSCME, Dist. Council 87 v. Luzerne Cnty.*, No. PERA-C-10-185-E, Final Order at 8 (PLRB April 17, 2010) (citing 29 U.S.C. §§2832(d)(2)(B), 2843). Although the County Chairpersons at the November 2009 meeting may have agreed with the Local Board's decision to seek competitive bids, the PLRB deemed such agreement "of no moment . . . because the [Local Board] has sole authority under the WIA and WDA to choose those providers." *Id.* Finally, the PLRB determined that the remedy ordered by the hearing examiner was incapable of execution. *See id.* at 8 n.7.

The Commonwealth Court affirmed in a published decision. *See AFSCME, Dist. Council 87 v. Luzerne Cnty.*, 77 A.3d 53 (Pa. Cmwlth. 2013) (*en banc*). The court focused on the PLRB's findings that the Local Board made the decision to contract out the Title I and EARN services, issued the requests for proposals, chose the successful bidders, and entered into contracts with them. Based on the credited testimony of Lucianne Vierling, the Local Board's executive director, and that of its chairperson, Martha Herron, as well as documentary evidence, the intermediate court concluded that substantial evidence supported the PLRB's finding that the County lacked control over the Local Board's decision to contract for these services through a competitive bid process. *See id.* at 58-59.

With respect to Title I services, the court acknowledged that the County's chief elected official participates to some degree in the operation of the Local Board – for example, the Local Board "partners with the chief elected official to create a local plan,

which is then submitted to the Governor for approval, and the chief elected official approves the [L]ocal [Board's] budget." *Id.* at 60. However, the federal and state statutes, in the court's view, place the decision-making power in the hands of the Local Board concerning how WIA funds are to be spent. *See id.* (citing Section 117 of WIA and Section 501 of WDA).[9]

Turning to the EARN program, *see supra* note 5, the Commonwealth Court stated that services under that program are governed by neither the WIA nor the WDA, but by a contract between L&I and the Local Board. According to the court, pursuant to such contract it is ultimately the LMC exercising oversight of DPW programs, and not the Local Board, which selects EARN service providers. The court pointed to DPW's May 12, 2010, warning letter to the Local Board, *see supra* note 7, as supporting its determination in this regard. *See AFSCME*, 77 A.3d at 61-62.

President Judge Pellegrini dissented, positing that workforce investment boards are part of county government under the WDA, and that the County maintained functional control over the Local Board in the present case. The dissent noted that, under the WDA, the Local Board's purpose is "to advise and assist the chief elected official in the . . . counties served by the local workforce investment board by setting policy to promote effective workforce investment programs in a designated geographic area." 24 P.S. §6250.501(b). Further, the dissent stated that the County, not the Local Board, approves the budgeting of funds and is responsible for any misuse of the funds.

---

[9] Section 117 of the WIA provides, in relevant part, that "[t]he chief elected official in a local area shall serve as the local grant recipient for, and shall be liable for any misuse of, the grant funds allocated to the local area [and] shall disburse such funds for workforce investment activities at the direction of the local board . . . immediately on receiving such direction[.]" 29 U.S.C. §2832(d)(3)(B)(i)(I), (III). Section 501 of the WDA substantially mirrors its federal counterpart. *See* 24 P.S. §6250.501(c)(1), (3). These provisions are discussed in more detail below.

The dissent thus concluded that the County had committed an unfair labor practice as charged by the Union. *See AFSCME*, 77 A.3d at 62-66 (Pellegrini, P.J., dissenting, joined by McGinley, J.).[10]

Currently, the Union asserts that the evidence demonstrates that the Local Board acted as an agent of the County in deciding to contract out the Title I and EARN work, so that the County ultimately bore responsibility for that decision. In particular, the Union highlights that the Local Board only became the fiscal agent for WIA-funded activities in November 2009 because the County designated it as such, and the Local Board only went forward with its plan to seek competitive bids after receiving approval from the County. Additionally, the Union observes that the Local Board communicated to bidders that any provider selection would be subject to approval by the County. In all these dealings, the Union maintains, the Local Board evidenced that it understood and accepted that it was acting on behalf of the County, and that the County was in overall control of the situation. The Union contends that the County, as well, manifested its intention that the Local Board would act on its behalf, again, primarily by designating the Local Board as its fiscal agent. Thus, the Union asserts that all three elements of common-law agency were satisfied. *See Scott v. Purcell*, 490 Pa. 109, 117, 415 A.2d 56, 60 (1980) ("The basic elements of agency are the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking." (internal quotation marks and citation omitted)).

_____

[10] The dissent also opined that it would be improper to delegate to a legal entity such as the Local Board, which is not accountable to the electorate at the ballot box, the ability to select service providers for Title I and EARN programs. Notably, however, no challenge based on non-delegation principles was before the court.

The Union also takes issue with the Board's and Commonwealth Court's understanding of the governing statutory framework as reposing in the Local Board the sole authority to identify and choose providers, portraying this conclusion as stemming from the lower tribunals' decision to view certain statutory provisions in isolation. A more comprehensive reading of the WIA and the WDA, the Union urges, clarifies that the Local Board's role is merely to "advise and assist" the County in "setting policy to promote effective workforce investment programs[.]" Brief for Appellant at 21-22 (quoting 24 P.S. §6250.501(b), and citing 29 U.S.C. §2832(a)). The Union claims, in this respect, that, if the Local Board is solely responsible for selecting service providers, the role of advisor and advisee will have been reversed. Furthermore, the Union notes that the County's chief elected official, and not the Local Board, is ultimately liable for any misuse of WIA grant funds. *See* 29 U.S.C. §2832(d)(3)(B)(i)(I), (II).

As for the EARN program, the Union simply maintains that there is no factual support for the suggestion that the Local Board controls funding for the program, and that the letter issued by L&I indicating that the LMC made the contracting decision for these services, *see supra* note 7, consists of hearsay and conclusory legal opinions based on DPW's Master Guidelines which were never entered into the record.[11] By contrast, the Union argues, it is a matter of record that the EARN program fell within the scope of the oral consent given by the county chairpersons at the November 2009 meeting, whereby the chairpersons agreed that the Local Board should hire service providers through competitive bidding. *See* Brief for Appellant at 26-27 & n.11.

Appellee, the PLRB, argues that the Commonwealth Court's decision is consistent with precedent establishing that a public employer is not responsible for

---

[11] The Union did not object to the introduction of the letter at the hearing. The County suggests it would fall under the business-records exception to the hearsay rule in any event. *See* Pa.R.E. 803(6); Brief for Intervenor at 25 n.6.

actions of an independent third party. The PLRB maintains, in this regard, that the record supports its conclusion that the Local Board acted as a third party, and not as the employer of the individuals represented by the Union, when it made the decision to utilize non-County employees and, as such, it owed no bargaining obligation to the Union.[12] As for whether the County controlled the Local Board's decision, the PLRB stresses that: the County did not take any action on the awarding of contracts to the private entities; the County, in fact, bid on the work for the bargaining unit employees; and the award letters and contracts themselves reflect that it was the Local Board, and not the County, that awarded the contracts. The PLRB suggests that, if the Local Board were merely acting as the County's agent, it would have been the County that entered into the contracts at the conclusion of the bidding process.

Further, the PLRB analogizes this case to *Ellwood City Police Wage & Policy Unit v. PLRB*, 731 A.2d 670 (Pa. Cmwlth. 1999), in which a district justice, at the request of a borough, began scheduling officers to appear in court during their regular workdays so as not to require police overtime work. The court concluded that the borough had not committed an unfair labor practice by failing to bargain because a third party – the district justice – was responsible for reduced overtime (and, thus, reduced overtime pay). In reaching this decision, the court explained that, although the district justice accommodated the borough's request, he could have ignored the request without consequence to himself; hence, the change in practice was attributable to the district justice and not the borough. *See id.* at 674. Likewise, the PLRB argues, the Local Board is an independent third party because its members do not serve at the

_____

[12] The PLRB notes as an aside that this is not the first time the Local Board sought bids for Title I services through a process in which the County Agency participated: in 2007, the County Agency was a successful bidder and entered into a contract with the Local Board to provide Title I youth programs through June 30, 2010.

pleasure of County officials and can only be removed for violating conflict of interest rules – meaning that the County lacked power to force the Local Board to award the work in question to County employees. Along these lines, the PLRB proffers that the Local Board is similar to a municipal authority, which is not an agent or representative of the municipality that created it, but is an independent agency. *See Commonwealth v. Lucas*, 534 Pa. 293, 295-96, 632 A.2d 868, 870 (1993). The PLRB claims, moreover, that the conclusion that the Local Board did not need County approval for its actions, but instead, was solely responsible for choosing Title I providers, is supported by the governing statutes, *see* 29 U.S.C. §§2832(d)(2)(B)-(D), 2832(d)(3)(B)(i)(III), 2843; 24 P.S. §§6250.501(c)(3), 6250.504(b)(7)(ii)(B), as well as the agreement in place between Luzerne and Schuylkill Counties' chief elected officials and the Local Board, *see* Joint Exh. 3, R.R. 235a-247a. *See* Brief for Appellee at 19-22.

Turning to the EARN services, and contrary to the Union's discounting of DPW's warning letter, the PLRB offers that such correspondence evidences the County's lack of control over the Local Board's contracting-out of those services and, as such, supports the PLRB's determination.

In all events, with regard to both the Title I and EARN programs, the PLRB forwards that: (a) any statement by the Local Board that the recommendations for service providers would be subject to County approval is not determinative unless the County actually had the authority to disapprove the Local Board's choices, which it did not; and (b) the remedy sought by the Union and recommended by the hearing examiner – rescinding the contracts with the private companies and returning the work to the County Agency – would be impossible for the County to carry out because the County is not a party to the contracts. In this regard, the PLRB suggests that, if the Union believes that the Local Board lacked authority to enter into the contracts without

the County's approval, it should not seek a remedy with the PLRB based on allegations against the County. Rather, according to the PLRB, the County Agency should file a complaint in court to void the contracts.

The County, as intervenor, highlights the deferential standard of review applicable to PLRB decisions and references aspects of the record it views as supporting the agency's determination. Primarily, the County stresses that it had no role, and took no action, in selecting providers. The County asserts that if it had retained decisional authority, it would have awarded the contracts to its own employees, as evidenced by the fact that the County attempted to secure the work by participating in the competitive-bid process. *See* Brief for Intervenor at 25-26, 35. The County also disputes the Union's contention that the elements of an agency relationship were present, suggesting that any such claim is undermined by the actions of the County and Local Board and the statutory framework. Finally, the County indicates that the only authority that it had over the Local Board consisted of its ability to select many of the Local Board's members – who, as the PLRB noted, do not serve at the County's pleasure – and to designate the Local Board as the fiscal agent for the NE075 workforce area. According to the County, this did not give it operational control over the Local Board's decision-making. *See id.* at 30.

We will affirm a PLRB ruling so long as its essential findings are supported by substantial evidence and there has been no constitutional violation, procedural irregularity, or error of law. *See* 2 Pa.C.S. §704; *City of Erie v. PLRB*, 612 Pa. 661, 671, 32 A.3d 625, 631 (2011). As the present dispute does not involve issues of constitutional dimension or challenges to the agency's procedure, we consider whether the PLRB's essential findings are supported by substantial evidence, and whether its decision is in accordance with law. *See 500 James Hance Court v. Pa. Prevailing*

*Wage Appeals Bd.*, 613 Pa. 238, 262, 33 A.3d 555, 569 (2011). It is within the PLRB's province, in the first instance, to weigh conflicting evidence, make credibility determinations, and draw reasonable inferences from established facts and circumstances. *See PLRB v. Fabrication Specialists, Inc.*, 477 Pa. 23, 33, 383 A.2d 802, 807 (1978).

Initially, the public employer in question is the County and not the Local Board. The Local Board is not a government entity and was not accused of violating PERA, notwithstanding that the Union's complaint is ultimately based on its actions. Thus, at the heart of this appeal is whether the Union is correct in suggesting that the County, in effect, controlled the Local Board's actions. While at first this may appear to be a purely factual question, it has a legal facet insofar as the Union argues that the County was able, under the governing statutory framework, to exercise operational control over the Local Board in its hiring decisions.

With regard to the factual component of the inquiry, the PLRB's central finding was that the decision to contract-out work previously performed by County Agency employees was made by the Local Board and not the County. *See AFSCME*, No. PERA-C-10-185-E, Final Order at 5. As to this finding, we observe, first, that there is some limited evidence to the contrary. Most prominently, the RFPs issued in March 2010 indicated that the Local Board's vendor selection would constitute a recommendation subject to approval by the County, and this is consistent with the way the selection process was described at a meeting with prospective bidders and in a media statement released by the Local Board at about the same time. Other proofs, however, suggest that the Local Board eventually realized that it had erred in believing it needed the County's approval to move forward and, accordingly, it entered into contracts with the prevailing bidders without receiving any input from the County.

The issue of whether County approval was necessary came to a head in early May 2010 when state-level agencies began to pressure the Local Board to move forward with the contracting process.[13] At approximately that time, the Local Board obtained an opinion from its attorney concluding that the Local Board, as fiscal agent, was authorized to make decisions concerning the disbursement of grant funds without the County's concurrence. *See* County Exh. 5, R.R. 772a; *see also* N.T., Oct. 8, 2010, at 200-03, R.R. 204a-206a (testimony of the Local Board's attorney to the same effect). As well, the Luzerne County Commissioners, although they may have been unhappy with the Local Board's decision not to re-engage the County Agency, concluded they had no power to override it. As noted, they too obtained an opinion from their solicitor, who reached the same conclusion as the Local Board's attorney. *See* N.T., Sept. 23, 2010, at 148; R.R. 152a (testimony of Ms. Petrilla). Also, multiple witnesses testified that the Local Board acted independently of County officials to implement workforce programs, notwithstanding that such officials appointed most of the Local Board's members. *See* N.T., Sept. 23, 2010, at 61, 72-73; R.R. 65a, 76a-77a (testimony of Ms. Vierling); N.T., Oct. 8, 2010, at 157, R.R. 161a (testimony of Ms. Enright); *id.* at 177-80, R.R. 181a-184a (testimony of Ms. Herron). Finally, the record is devoid of any indication that the County played a role in determining the RFP selection criteria, reviewing the RFPs or the bids, selecting the winning bids, negotiating contract terms, or awarding the contracts to the prevailing bidders.

---

[13] *See* County Exh. 2, R.R. 760a-761a (letter from Bryon Noon, Director DPW's Bureau of Employment and Training Programs, to Martha Herron, chairperson of the Local Board, warning of a possible loss of funding if the board did not "immediately" follow through and enter into contracts); *see also* County Exh. 1, R.R. 759a (letter from Christine Enright, Director of L&I's Bureau of Workforce Development Partnership, to Chairperson Petrilla, advising that time was of the essence and any decision by the Local Board not to award contracts to the selected vendors would require a vote of the board as well as an explanation of the reason for the decision); *supra* note 7.

Accordingly, we conclude that substantial evidence of record supports the PLRB's central finding that the Local Board, rather than the County, made the decision to award the Title I and EARN services work to the three private entities.

We turn now to whether the PLRB's ruling was "in accordance with law." 2 Pa.C.S. §704. The PLRB's conclusions are binding if they are reasonable and not arbitrary, capricious, or incorrect as a matter of law. *See Fraternal Order of Police v. PLRB*, 557 Pa. 586, 592-93, 735 A.2d 96, 99 (1999). The primary issue here is whether the County was able to control the Local Board's actions, meaning that the County *could* have (and thus, according to the Union, *should* have) directed the Local Board to refrain from contracting with the outside entities so that bargaining with the Union could occur as a preliminary matter. The PLRB rejected the Union's position that the County could have exerted control over the Local Board's actions in this regard. *See AFSCME*, No. PERA-C-10-185-E, Final Order at 6. In reviewing this determination we consider various aspects of the WIA and WDA, as well as the record, in an attempt to understand the nature of the Local Board and its relationship to the Luzerne County Commissioners in carrying out its responsibilities under the workforce legislation.

Local workforce investment boards are established pursuant to the WIA and WDA and certified by the Governor. *See* 29 U.S.C. §2832(a); 24 P.S. §6250.501(a)(2). Their legislatively stated purpose is to "advise and assist the chief elected official in the county or counties served by the local workforce investment board by setting policy to promote effective workforce investment programs in a designated geographic area." 24 P.S. §6250.501(b). Each local workforce investment board, in partnership with the chief elected official for the local workforce area involved, is required to develop a comprehensive five-year local plan for submission to the Governor. *See* 29 U.S.C. §2832(d)(1); 24 P.S. §6250.504(a). The plan must include such items as an

identification of the workforce investment needs of businesses and individuals in the area, a description of the one-stop delivery system to be established in the area,[14] and "a description of the competitive process to be used to award the grants and contracts in the local area for activities carried out under" the WIA. 29 U.S.C. §2833. The local board's functions additionally subsume the selection of one-stop operators and the identification of eligible "providers," *id.* §2832(d)(2), a category that includes providers of the Title I services including those at issue here – namely, youth services and services for adult and dislocated workers. *See id.* §2832(d)(2)(B), (C).

The Union has, throughout this litigation, relied significantly on the advisory and assistive aspects of the above description as demonstrating that local boards are not tasked with making substantive decisions concerning how grant monies are to be spent, but rather, are limited to an advisory role in relation to the chief elected official – in this case Chairperson Petrilla. We, however, see this provision in a somewhat more mixed light. For example, although the Local Board is meant to provide assistance and advice, it is also responsible for "setting policy." The setting of policy suggests a decisional authority that is beyond merely advisory or assistive in nature. *See, e.g., In*

---

[14] A one-stop delivery system is defined as a "collaborative network of service providers designed to deliver to customers high-quality information access, lifelong learning, transitional or work support services or activities and economic investment services and activities at a county or multicounty level." 24 P.S. §6250.103 (relating to definitions); *see also* 29 U.S.C. 2841 (relating to establishment of one-stop delivery systems). *See generally AFSCME*, No. PERA-C-10-185-E, Final Order at 4 n.6. Each one-stop operator enters into an agreement for its services with the local workforce investment board, and its "role may range between simply coordinating service providers within the center, to being the primary provider of services within the center, to coordinating activities throughout the [o]ne–[s]top system." 20 C.F.R. §662.400(a). *See generally* Keir Bancroft, *Maximizing the Return on Workforce Investment: A Review of the Workforce Investment Act of 1998 and Suggestions on How to Resolve Issues Arising in its Implementation*, 2002 GEO. J.L. & PUB. POLICY 191 (discussing efficiencies associated with one-stop delivery systems).

*re Stout*, 521 Pa. 571, 585, 559 A.2d 489, 496 (1989). Even assuming there is room for reasonable disagreement on this point, Section 501(b) is general and prefatory in nature, and is not intended to supply an exhaustive delineation of a local board's duties. The description above reflects that local boards have other responsibilities, and Section 501(b) should be considered in conjunction with other facets of the legislation, especially those which speak to the mechanism by which federal and state funds are to be disbursed. *See generally* 1 Pa.C.S. §1921(a) ("Every statute shall be construed, if possible, to give effect to all its provisions.").

Such provisions indicate, first, that Congress and the Pennsylvania General Assembly contemplated that a competitive process would be used to obtain workforce investment services funded by WIA-related grants. This is evident most explicitly in the statutory mandate that youth work be awarded by the local board via grants or contracts obtained "on a competitive basis," 29 U.S.C. §§2832(d)(2)(B), 2843, as the Commonwealth Court highlighted, *see AFSCME*, 77 A.3d at 60 n.15, and as the Union now concedes. *See* Reply Brief for Appellant at 4. It is also implied from the mandate in Section 2833 of the federal act that all five-year plans describe "the competitive process" to be used for WIA-related grants. Indeed, this may explain why the Union competitively bid for the work in 2007, two years before fiscal agent status was transferred to the Local Board. Second, these aspects of the enactments indicate that it is the local workforce investment board that is, in the first instance, meant to be involved in provider selection. The question becomes, then, whether local officials are also involved in these activities to a degree that they are able to exercise control over the local board's decisional functions.

We acknowledge that certain facets of the statutory scheme implicate participation by local elected officials. As regards the submission of a five-year plan to

the Governor, the WIA and the WDA both specify that the plan is to be developed "in partnership with the chief elected official of the county or counties served by the local workforce investment board." 24 P.S. §6250.504(a); *see* 29 U.S.C. §§2833(a), 2832(d)(1). Also, as an initial matter at least, these officials serve as the local grant recipients of the federal funds, and they are liable for any misuse of those monies. *See* 29 U.S.C. §2832(d)(3)(B)(i)(I); 24 P.S. §6250.501(c)(1). Finally, the local board's budget is subject to approval by the chief elected official. *See* 29 U.S.C. §2832(d)(3)(a).

Still, we are unaware of any aspect of the legislation at either the federal or state level that expressly allocates to local elected officials the authority to select service providers or otherwise to direct how grant funds are to be disbursed. Although the WIA and WDA designate the chief elected official of the primary local governing body as the initial recipient of funds – terming her the "local grant recipient," 29 U.S.C. §2832(d)(3)(B)(i)(I); 24 P.S. §6250.501(c)(1) – they make no mention of her ability to hire service providers or otherwise determine how the monies are to be spent. Indeed, to the contrary, these statutes allocate such responsibility to the local board.

This becomes evident upon consideration of the provisions pertaining to the administration of grants. Subsection 2832(d)(3)(B) of the federal act states, in relevant part:

> (i) Grant recipient
>
>> (I) In general
>>
>> The chief elected official in a local area shall serve as the local grant recipient for, and shall be liable for any misuse of, the grant funds allocated to the local area . . ..
>>
>> (II) Designation
>>
>> In order to assist in the administration of the grant funds, the chief elected official . . . may designate an entity to serve as

a local grant subrecipient for such funds or as a local fiscal agent. Such designation shall not relieve the chief elected official . . . of the liability for any misuse of grant funds as described in subclause (I).

(III) Disbursal

The local grant recipient or an entity designated under subclause (II) *shall disburse such funds for workforce investment activities at the direction of the local board . . ..*

29 U.S.C. §2832(d)(3)(B)(i)(I)-(III) (emphasis added). Subsection 501(c) of the WDA is substantively identical. *See* 24 P.S. §6250.501(c)(1)-(3).

As can be seen from the above, the chief elected official may elect between retaining her status as "local grant recipient" or designating an entity under subsection (II) to serve as "local grant subrecipient." Either way, the recipient or subrecipient (as the case may be) must follow the directives of the local board in disbursing the funds, and there is no suggestion that these directives may be dictated by anyone else.[15] Here, Chairperson Petrilla made the Local Board the subrecipient in November 2009,[16] and it would be highly attenuated to suggest that any subsequent decision made by the Local Board as to fund disbursement is attributable to the County on that basis alone.

Nevertheless, the Union highlights that, even under such circumstances, the chief elected official remains liable for any misuse of the monies involved. *See* 29

---

[15] Throughout her testimony, Ms. Petrilla used the term "fiscal agent" to describe the status that had attached, first to the County Agency, and then to the Local Board. In context she appears to have intended the term to subsume the concept of a local grant subrecipient per subsections 2832(d)(3)(B)(i)(II) and 501(c)(2). The WIA and WDA do not define "fiscal agent" or clearly delineate the phrase as a concept distinct from that of local grant subrecipient. If anything, the acts often appear to use the terms interchangeably. *See* 29 U.S.C. §2832(d)(3)(B)(i)(II); 24 P.S. §6250.501(c)(2). Thus, for present purposes we will also use the phrases interchangeably.

[16] There is no evident statutory prohibition on a local board being the subrecipient.

U.S.C. §2832(d)(3)(B)(i)(II), 24 P.S. §6250.501(c)(2). The Union emphasizes this point by observing that Ms. Enright, Director of L&I's Bureau of Workforce Development Partnership, wrote to Ms. Petrilla rather than the Local Board when, in May 2010, L&I began to suspect that the Local Board was unduly delaying the awarding of contracts for workforce development services. *See supra* note 13.

It does not follow, however, that the chief elected official retains control over the local board's decisional process in directing disbursement of monies received. Liability for misuse may be predicated on an ability to make indemnification for misappropriated funds, which a county, with its taxing power, is in a better position to accomplish than a local board. *Cf. Brock v. Pierce County*, 476 U.S. 253, 257, 106 S. Ct. 1834, 1837 (1986) (describing a county's obligation to make indemnification for misused funds under a predecessor statute to the WIA). Moreover, the "shall not relieve" phraseology suggests that the assignment of liability is aimed at incentivizing the chief elected official to exercise caution and sound judgment in choosing an entity to fulfill the role of fiscal agent/grant subrecipient – and to change that entity when necessary.

Here, the record reveals that these provisions had their intended effect in the present case. Ms. Petrilla was very concerned about the possible loss of funding due to the deficiencies identified by L&I, and she felt that "one of the first and foremost problems" was that "the fiscal agent was both performing the services and controlling the money." N.T., Sept. 23, 2010, at 146, R.R. 150a. Accordingly, with the concurrence of the other Luzerne County Commissioners, she transferred fiscal agent status to the Local Board. *See id.* ("[T]he Commissioners agreed that there needs to be a separation of powers. So, with that, the fiscal agent was transferred [to the Local Board].") Thus, Ms. Petrilla acted within her authority to designate a new fiscal agent/grant subrecipient, and her decision resulted in the amelioration of deficiencies that remained outstanding

after the County Agency submitted its initial plan of corrective action to the state. The state agencies' performance concerns were ultimately allayed, moreover, as evidenced by their directives that the Local Board enter into contracts with the prevailing bidders in a timely manner.

Finally, it should be evident from the foregoing that there was no common-law agency relationship between the County and the Local Board. There is little support for the premise that Ms. Petrilla or any other County official manifested an understanding that the Local Board would act at the County's behest or follow its directions. To the contrary, by May 2010, Ms. Petrilla and the Local Board were both of the view that neither she nor the County Commissioners collectively had the power to direct the Board's actions or override its selection of service providers. Nor is there any aspect of the statutory scheme that gave the County *de facto* control over the Local Board's decisions. Although the County Commissioners retained appointment power relative to a majority of the Local Board's membership, *see* Union Exh. 11, R.R. 707a-749a (reflecting letters appointing or reappointing various persons to the Local Board), these individuals served for fixed terms and not at the pleasure of the Commissioners. There is therefore no basis to believe they were acting as agents of the County.

To summarize, the state and federal workforce investment acts create a system whereby the chief elected officials are involved in the creation and oversight of local workforce investment boards and work together with those boards to develop and implement a workforce investment plan approved by the Governor. The chief elected officials also exercise oversight at a high level through their appointment and re-appointment powers relative to the Board's membership, and remain liable for the misuse of public funds. However, the local boards' functional authority to act derives from statute, and a close review of the WIA and WDA indicates that the local boards

direct disbursement of grant monies for Title I services free of county control. Here, the PLRB concluded that the Local Board, and not the County, made the decision to seek competitive bids for these services and, for the reasons given, we find this conclusion to be in accordance with law.[17]

The above analysis is based on the WIA and WDA and, as such, is limited to the Title I services. Whether the County committed an unfair labor practice through the Local Board's awarding of the EARN-related work outside of the County Agency is a separate question. Neither the record nor the parties' advocacy discloses the governing statutory framework for those activities. The evidence that most directly touches upon the topic is comprised of the letter from DPW to Martha Herron, chairperson of the Local Board, *see supra* notes 7, 13, and the March 2010 RFP pertaining to EARN services. The letter portrays the County as having no involvement in the selection of a provider, referencing DPW's Master Guidelines and the Local Management Committee – an entity that is not substantially illuminated by the record or the briefs. For its part, the RFP is consistent with the letter in portraying the LMC as retaining essential hiring authority, *see, e.g.*, EARN RFP at 10, R.R. 377a ("The LMC reserves the right to accept or reject any or all proposals submitted[.]"); *see also id.* ("At the discretion of the LMC, contractors may be offered an additional one-year extension."), and the PLRB found, based on this document, that the LMC "oversees, manages, and directs" the EARN programs at issue here. *See AFSCME,* No. PERA-C-10-185-E, Final Order at 2 n.4.

In all events, the Union's presentation on the subject is very limited and consists of an attack on the letter as hearsay and on the propriety of referencing DPW's Master Guidelines insofar as they were not placed in evidence. *See* Brief for Appellant at 26-

---

[17] As a consequence, the proposed remedy is impossible of execution, as the County is not a party to the contracts that the hearing examiner suggested the County should rescind.

27. The Union generally faults the PLRB for failing to prove its case. *See id.* at 26 ("[N]either the [PLRB] nor the Commonwealth Court suggested that the [Local Board] had sole authority to award those contracts."). We note, however, that, when an unfair labor practice complaint is brought before the PLRB pursuant to PERA, the complainant bears the burden of proof. *See St. Joseph's Hosp. v. PLRB*, 473 Pa. 101, 104, 373 A.2d 1069, 1070 (1977). The Union does not suggest any basis to believe it has carried its burden in this regard.

Accordingly, the order of the Commonwealth Court is affirmed.


Former Chief Justice Castille, former Justice McCaffery and Mr. Justice Stevens did not participate in the decision of this case.

Messrs. Justice Eakin and Baer and Madame Justice Todd join the opinion.