# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Amalgamated Transit Union Local 1279, : 
                        Petitioner : 
                                       : 
                  v. :    No. 1134 C.D. 2018
                                         :    Argued: April 9, 2019
Pennsylvania Labor Relations Board, : 
                       Respondent : 


**BEFORE:**     **HONORABLE RENÉE COHN JUBELIRER,** Judge
                           **HONORABLE ANNE E. COVEY,** Judge (P)
                           **HONORABLE MICHAEL H. WOJCIK,** Judge


<u>**OPINION NOT REPORTED**</u>


**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**               **FILED: April 30, 2019**

Amalgamated Transit Union Local 1279 (Union) petitions for review of the July 17, 2018 Final Order of the Pennsylvania Labor Relations Board (Board), in which the Board dismissed the exceptions Union filed to a Proposed Decision and Order (Proposed Decision) of the Hearing Examiner. The Board found Union did not establish that Cambria County Transit Authority (CamTran) committed unfair labor practices when it terminated Eileen Zibura (Zibura), a bus driver and Union officer, for an incident involving another employee and a knife. Union argues the Board erred in not finding CamTran committed the unfair labor practices, committed an error of law in concluding the protected activity was not proximate

in time to infer anti-union animus, and misinterpreted a provision of the Public Employe Relations Act (PERA).[1]  Discerning no errors, we affirm.

## I.     Background

The facts as found by the Hearing Examiner are summarized as follows. Zibura worked at CamTran since 1989, during which time she served in various capacities as a Union officer (president, recording secretary, and most recently financial secretary) and a member of the negotiation team for 20 years.  (Finding of Fact (FOF) ¶ 3.)  She was suspended for five days for an accident in September 2014, but an arbitrator subsequently reduced the discipline to six months of probation.  (*Id.* ¶ 4.)  Because Union was successful in the arbitration of that grievance, CamTran was assessed the $7685.66 arbitrator bill.  (*Id.*)  One week later, CamTran removed a water cooler from the drivers' room.  (*Id.* ¶ 5.)  When confronted about the water cooler's removal, the Chairman of the Board for CamTran (Chairman) told Zibura it was because her arbitration cost CamTran too much money.  (*Id.*)  "Zibura was the most outspoken" Union member concerning the water cooler.  (*Id.*)  As financial secretary, Zibura served on the pension committee.  At an April 16, 2016 meeting, she moved to authorize a buy-back provision, which management, including CamTran's Executive Director, opposed. (*Id.* ¶ 6.)  She also testified at three or four arbitrations for other Union members, the most recent one on September 26, 2016.  (*Id.* ¶ 7.)

On Friday, December 9, 2016, Zibura, Union President, and another driver were in the breakroom at the Transit Center.  Also present was an assistant from human resources (HR Assistant), who was hanging posters.  Zibura asked HR

---

[1] Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.101-1101.2301.

2

Assistant, "Why do you come out of your cubby hole once a year." (*Id.* ¶ 8.) During this discussion, Zibura picked up an eight-inch knife that had been in the breakroom for years and put it down. HR Assistant left the breakroom and did not appear visibly distressed or upset. (*Id.*) HR Assistant subsequently completed an incident report that same day wherein she stated:

> 12/09/2016 – Transit Center/Drivers Room.
> At approximately 1:10 p.m. I was at the Transit Center . . . to hang the new workers['] comp physician panels and the 2017 pay schedule . . . . I walked into the driver's room. [Union President] was sitting at the table and [another driver] was sitting on the couch. I had my back turned to the room as I was hanging the papers and removing [the] old ones on the bulletin board besides [sic] the fridge. While I was hanging papers, [Zibura] walked in. She asked what I was doing there and I told her that I was hanging new notices for workers['] comp so they knew where to go in case someone got hurt. She said to get out that it was their [the drivers'] room. She then asked if I wanted to play a game and when I turned towards her she picked up a long knife on top of the microwave and pointed it towards me a few inches from me. I told her I didn't want to play any game and to put the knife down. She then said "here catch" and motioned like she was going to throw it at me. She continued to hold the knife upwards towards me and I asked her to put the knife down again. She held the knife toward me until I finished hanging the papers and walked out of the room.

(*Id.* ¶ 9 (quoting CamTran Ex. 3, Reproduced Record (R.R.) at 543a).)

The following Monday (December 12, 2016), Zibura was relieved from her regular shift and told to report to the main office, where she was informed that she was under investigation for the incident that occurred on Friday. (FOF ¶ 10.) Human Resource Manager (HR Manager) and Director of Facilities, Safety, Security and Risk Management (Director of Facilities) conducted the investigation and recommended to Executive Director that Zibura be discharged for violating CamTran's weapons policy. (*Id.* ¶¶ 11, 13.) Executive Director makes final

3

decisions on discipline and informed Zibura by letter on December 20, 2016, that she was being terminated. (*Id.* ¶¶ 13-14.) According to the letter, after reviewing the investigation and meeting with Zibura herself, Executive Director did not believe "the totality of the circumstances . . . support[ed] [Zibura's] version of the facts." (*Id.* ¶ 14 (quoting CamTran Ex. 10, R.R. at 563a).) The letter stated Zibura was:

> being terminated, effective immediately, [for] the following serious behavior and egregious misconduct:
>
> 1. You directed verbal hostility toward a management employee by entering the room and asking what she was doing in "their" room and why she came out of her "cubby hole," creating an unwelcome atmosphere.
>
> 2. You were in possession of a knife on [CamTran] Property, endangering the safety of all employees. You intimidated and threated [sic] an employee of CamTran, [HR Assistant], by asking if she wanted to "play a game," picking up the knife and holding the point towards her, motioning to throw the knife at her at one point, and not putting the knife down after asked.
>
> 3. You disregarded [HR Assistant]'s attempts to deescalate the situation by continuing to hold the knife and moved your arm toward her as to throw/toss the knife at her. Even though you did not throw/toss the knife, it created a significantly unsafe and intimidating work environment.
>
> The knife is considered a weapon, as it is not used for its intended purpose, which could have resulted in serious bodily injury. In today's climate of threats and violence in the workplace, there is no justifiable reason for this behavior.
>
> Under Employee Responsibilities Section – EMPL – 20 of the Employee Handbook, it states:
>
> - 7. Possession of Any Weapon While on [CamTran] Property: A weapon is defined as any instrument that is not used for its intended purpose or an implement of crime that could result in

4

serious bodily injury or endangers the safety of employees or the public. First Offense – Discharge.

(*Id.* (quoting CamTran Ex. 10, R.R. at 563a-64a).)

The Hearing Examiner found HR Manager and Director of Facilities "did not consider Zibura's Union affiliation or activities" when they recommended termination and Executive Director did not consider Zibura's Union activities in making her decision to discharge Zibura. (*Id.* ¶¶ 12, 15.)

Zibura grieved her termination, and an arbitrator ultimately set aside her termination, concluding CamTran did not meet its burden of proof to support termination. The arbitrator did find that Zibura's conduct rose to the level where discipline was proper and ordered reinstatement without back pay. (*Id.* ¶ 16; Union Ex. 11, R.R. at 507a-08a.)[2]

Union filed charges of unfair labor practices against CamTran, alleging violations of Section 1201(a)(1)-(4) of PERA, 43 P.S. § 1101.1201(a)(1)-(4).[3] The

_____

[2] CamTran appealed the arbitrator's decision to the Court of Common Pleas of Cambria County. (R.R. at 511a-28a.)

[3] Section 1201(a)(1)-(4) provides, in relevant part:

Public employers, their agents or representatives are prohibited from:

(1) Interfering, restraining or coercing employes in the exercise of the rights guaranteed in Article IV of this act.

(2) Dominating or interfering with the formation, existence or administration of any employe organization.

(3) Discriminating in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any employe organization.

**(Footnote continued on next page…)**

5

Board issued a complaint, and the matter was assigned to the Hearing Examiner who conducted a hearing on November 1, 2017.  At the hearing, Zibura, Union President, an employee who worked at the bus stop shop just outside the breakroom the day of the incident, the other driver present in the breakroom during the incident, and a retired driver who was involved in a verbal altercation with another employee testified for Union.  Employer presented the testimony of HR Assistant, HR Manager, Director of Facilities, and Executive Director.

Following post-hearing submissions by the parties, the Hearing Examiner issued a Proposed Decision and Order on April 20, 2018.  Therein, the Hearing Examiner concluded CamTran did not commit unfair trade practices under Section 1201(a)(1)-(4).  With regard to the claim under Section 1201(a)(2), the Hearing Examiner concluded this provision prohibits company unions, and because Union did not allege CamTran formed a company union, the Hearing Examiner dismissed the claim.  The Hearing Examiner also concluded that Union did not establish CamTran discriminated against Zibura for filing affidavits, petitions, or complaints with the Board and, accordingly, dismissed Union's claim under Section 1201(a)(4).  As for Union's claim under Section 1201(a)(3), the Hearing Examiner found Union met its burden of proving Zibura engaged in protected activities and that CamTran was aware that Zibura engaged in at least some of those activities, but Union did not establish anti-union animus.  The Hearing Examiner noted there

---

**(continued…)**

> (4) Discharging or otherwise discriminating against an employe because he has signed or filed an affidavit, petition or complaint or given any information or testimony under this act.

43 P.S. § 1101.1201(a)(1)-(4).

6

was no direct evidence of such animus and declined to infer such animus existed. Specifically, the Hearing Examiner found:

> the following facts . . . weigh heavily against an inference of anti-union animus. First, the decision to terminate Zibura was not made in close temporal nexus to any known engagement in protected activity by Zibura. She testified in an arbitration hearing on September 26, 2016, and was not terminated until December 12, 2016. I find that, based on the record as a whole, this is a significant lapse in time and shows that the decision to terminate Zibura was not motivated by animus. Other known protected activity occurred even more remote in time: the committee meeting where Zibura advocated for a buy-back plan and complained about the removal of a water cooler happened in April 2016 and her victorious arbitration against CamTran occurred in 2015. Second, in this matter CamTra[n] has adequately explained the termination of Zibura. Importantly, [Executive Director, HR Manager, and Director of Facilities] credibly testified that their decision to terminate Zibura was based on their crediting the account of events by [HR Assistant] and their interpretation of CamTran's weapon policy which calls for discharge on the first offense. [Executive Director, HR Manager, and Director of Facilities] all credibly testified that they did not consider Zibura's Union affiliation or engagement in protected activities at any relevant point in their investigation and discipline determination. Further, I do not find the fact that, based on the decision of the Arbitrator . . . to rescind the termination, that CamTran may have made the wrong decision to be evidence of animus in this matter. An incorrect disciplinary decision, is not, by itself, a statutory violation. Third, there is no evidence in this record that the CamTran management involved in the discipline process . . . made any anti-union statements or statements which would tend to show their mind as harboring animus against Zibura's engagement in protected activities.

(Proposed Decision and Order at 7, R.R. at 103a-04a.)

The Hearing Examiner also rejected Union's attempt to infer animus based upon CamTran's failure to follow progressive discipline, finding "the discipline in this matter was reasonably related to a credible interpretation of the alleged events, even if an arbitrator later found CamTra[n] to have made an error with regard to

7

discipline." (*Id.*) The Hearing Examiner likewise rejected Union's argument of disparate treatment, noting that the other incident did not involve weapons. (*Id.*) As a result, the Hearing Examiner dismissed Union's claim under Section 1201(a)(3).

The Hearing Examiner similarly dismissed Union's claim under Section 1201(a)(1). The Hearing Examiner found that "Zibura had not recently engaged in protected activity" and the conduct for which she was disciplined was not considered a protected activity. (*Id.* at 8.) Thus, the Hearing Examiner concluded "a reasonable employe would not be coerced in their [sic] exercise of protected rights due to Zibura's termination." (*Id.*) Moreover, the Hearing Examiner found that "even if a reasonable employe would be coerced by CamTran's actions, CamTran had legitimate reason for its decision to discipline Zibura," and "[t]his legitimate reason would outweigh any coercive effect that could be found on this record." (*Id.*)

Union filed exceptions to the Proposed Decision and Order, which the Board dismissed by Final Order dated July 17, 2018. The Board concluded the Hearing Examiner did not err in finding no evidence of discriminatory animus and *Lancaster County v. Pennsylvania Labor Relations Board*, 124 A.3d 1269 (Pa. 2015), upon which Union relied, was distinguishable for a number of reasons. As a preliminary matter, the Board noted that "[w]here there is conflicting testimony as to motive, it is the function of the Hearing Examiner to assess the weight of the testimony provided and to determine the facts based on those credibility determinations." (Final Order at 5 (citations omitted).) First, the Board noted that unlike *Lancaster County*, where the protected activity was contemporaneous to the discipline, here, it was not. (*Id.* at 6.) The Board further noted that while timing

8

may be evidence of an unlawful motive, it is not determinative, and when the record is considered as a whole, the Hearing Examiner did not err in not inferring animus. (*Id.* at 6-7.) Second, unlike in *Lancaster County*, here there was not substantial evidence of disparate treatment because the other altercation between employees did not involve a violation of CamTran's weapons policy. (*Id.* at 7.) Third, the weapons policy here expressly called for termination for a first offense, whereas the policy in *Lancaster County* was progressive. (*Id.*) "Fourth, and most importantly," the Board noted, "in *Lancaster County*, the [h]earing [e]xaminer rejected, as not credible the employer's assertion that it would have fired the employes even in the absence of the union organizing drive," but "[h]ere, . . . the Hearing Examiner found CamTran's witnesses credibly testified that they decided to terminate . . . Zibura's employment because of CamTran's weapons policy," not Zibura's protected activities. (*Id.*) As a result, the Board concluded Union did not meet its burden of proving an unfair labor practice under Section 1201(a)(3), and, therefore, the burden never shifted to CamTran to show it would have taken the same action anyway. (*Id.*) Regardless, the Board stated that had the burden shifted to CamTran, "the record contains substantial evidence, credited by the Hearing Examiner, that . . . Zibura was discharged based on CamTran's belief that she had violated its weapons policy." (*Id.*)

The Board further concluded the Hearing Examiner did not err in dismissing Union's claim under Section 1201(a)(4) because there was no evidence that Zibura signed or filed the charge of unfair labor practices related to removal of the water cooler in October 2015. (*Id.* at 8.) Nor did Union prove CamTran harbored anti-union animus. (*Id.*)

9

Concerning the claim under Section 1201(a)(1), the Board concluded that, "under the totality of the circumstances," Zibura's termination would not tend to interfere with or coerce employes from engaging in protected activities. (*Id.*) Finally, with regard to the claim under Section 1201(a)(2), the Board, like the Hearing Examiner, concluded this provision was "limited to preventing an employe organization from becoming so controlled or assisted by the employer that the employe organization is indistinguishable from the employer." (*Id.* at 9 (citation omitted).) The Board explained that claims such as an employer terminating an employe because of the employe's involvement in collective bargaining or an employer refusing to bargain with the employe representative's chosen negotiator, fall under other provisions, namely Section 1201(a)(3) and (5), respectively. (*Id.*) These claims are not "subsumed" by Section 1201(a)(2). (*Id.*)

Because Union did not meet its burden of establishing violations of Section 1201(a)(1)-(4), the Board concluded the Hearing Examiner did not err in dismissing the charges, and the Board made the Hearing Examiner's Proposed Decision and Order absolute and final. (*Id.*) This appeal followed.

**II.        Parties' arguments**

Union argues the Board erred:[4]  (1) in failing to find CamTran violated Section 1201(a)(3), and by not inferring anti-union animus when Zibura's protected activity was proximate in time to her discipline; (2) in disregarding the plain language of Section 1201(a)(2) and finding it pertains only to the prohibition

---

[4] We have consolidated and reordered Union's arguments for ease of discussion.

10

of company unions and not interfering with a union's existence or administration; and (3) in failing to find CamTran violated Section 1201(a)(1).[5]

Regarding the first issue, Union argues the Board's finding is against precedent and not supported by substantial evidence. It notes Zibura was engaged in numerous acts of protected activity, about which her supervisors knew. It also asserts that there was evidence from which anti-union animus could have and should have been inferred. Specifically, Union argues that unlawful motive could be inferred by CamTran's failure to follow progressive discipline, noting that "picking up the knife and putting it back down . . . cannot possibly be sufficiently serious to warrant proceeding directly to termination." (Union's Brief (Br.) at 22.) It points out there was no verbal threat, police were not contacted, and Zibura was not immediately removed from work but instead was removed three days later, all of which is evidence that the reason for her termination was not credible. In short, Zibura's "penalty was disproportionate to the offense," and "at most," Union argues, the incident was "a joke in bad taste." (*Id.* at 24, 28.) In addition, Union argues Zibura was treated differently from similarly situated males, pointing to the altercation of two male drivers, neither of whom were disciplined.

Union further argues anti-union animus should have been inferred based upon the timing of Zibura's protected activities and her discipline, noting that leading up to her discharge, Zibura testified for another employee and the discharge occurred shortly before negotiations on a new collective bargaining

---

[5] Although Union raised the issue of Section 1201(a)(4) in its Petition for Review, it did not address that issue in its brief. It therefore appears either to have abandoned or waived that claim. Pennsylvania Rules of Appellate Procedure 2116(a), 2119, Pa.R.A.P. 2116(a), 2119; *AFSCME, Dist. Council 47, Local 2187 v. Pa. Labor Relations Bd.*, 41 A.3d 213, 222 (Pa. Cmwlth. 2012).

11

agreement (CBA) were scheduled to begin. It claims her testimony at the other driver's arbitration occurred within three months of her termination, and three months has been held sufficient to infer animus in other cases.

Next, Union argues the Board misinterpreted Section 1201(a)(2) by limiting it to apply only to prohibitions against company unions. Union argues the plain language of Section 1201(a)(2) demonstrates it also protects against interference with the existence and administration of employe organizations and is not restricted to only domination of or assistance to employe organizations. According to Union, CamTran violated Section 1201(a)(2) by interfering with administration of Union by attempting to prevent Zibura from participating in upcoming negotiations of the new CBA.

Finally, Union asserts that CamTran committed both an independent and derivative violation of Section 1201(a)(1). It argues a reasonable employee would be coerced by witnessing a 30-year employee and union officer being terminated, which is sufficient to support an independent violation of Section 1201(a)(1). Also, because CamTran violated other sections of the PERA, this supports a derivative claim, Union claims. Union asks this Court to reverse the Board's Final Order and reinstate Zibura to her former position and make her whole for all lost wages, benefits, and seniority since her termination.

The Board responds that Union did not meet its burden under Section 1201(a)(3). It acknowledges that Union established the first two elements of such a claim – protected activity and employer's knowledge of the protected activity but argues Union did not prove the third element – anti-union animus. The Board argues that timing is only one factor to consider in inferring animus, but claims it is not determinative. Here, the Board claims an intervening event, the knife incident,

12

broke the nexus.  The Board asserts the discipline here was not contemporaneous with the protected activity, like it was in *Lancaster County*.  Further, the Board argues there was no evidence of disparate treatment because the two situations were not sufficiently similar, as one involved a verbal altercation between employees and this incident involved a knife.  The Board also argues animus should not be inferred from failure to follow progressive discipline because CamTran had a zero-tolerance policy when it came to weapons; therefore, it did not need to follow progressive discipline with Zibura.  Moreover, the Board notes CamTran did not deviate from its policy, but followed it, just as it did with its investigation into the incident.  The Board emphasizes that credibility determinations are within its purview, and it accepted the Hearing Examiner's factual determinations, which credited CamTran's witnesses.  The Board also noted that even under a mixed motive analysis, there was no error because CamTran established it would have discharged Zibura anyway.

With regard to Section 1201(a)(2), the Board asserts that the purpose of this provision is to prevent an employer from controlling or assisting an employee organization such that the employee organization becomes indistinguishable from the employer.  As the agency charged with enforcing the PERA, the Board argues its interpretation is entitled to deference.  It further notes, as it did in its Final Order, that the complained of conduct falls within the purview of other subsections of Section 1201.

As to Union's claimed violation of Section 1201(a)(1), the Board argues there was no violation because terminating an employee for violating a company's weapons policy would not interfere or coerce reasonable employees from engaging in protected activity.

CamTran intervened in this matter and argues that Union is simply disagreeing with the facts as found by the Hearing Examiner, and given this Court's limited review, those determinations cannot be overturned. It argues HR Assistant was not involved in Union or personnel matters, so she had no motive to lie about the incident. Furthermore, CamTran argues the totality of the circumstances show HR Assistant did not think it was a joke. CamTran points out that management thoroughly investigated the matter, as it would any other incident, before taking action.

CamTran also argues there was no evidence it was motivated by anti-union animus or was trying to discourage Union membership. According to CamTran, the protected activities were removed in time and it was unaware of some of the protected activities. As for Union's claim of disparate treatment, CamTran argues the incident with the other drivers did not involve a weapon; therefore, they are not similarly situated. In short, CamTran argues there is no evidence of discrimination in its investigation or retaliation in its discipline.

## III.    Discussion

Preliminarily, we note our review of the Board's Final Order is limited to "whether there has been a violation of constitutional rights, an error of law, [or] procedural irregularity, or whether the findings of the agency are supported by substantial evidence." *Borough of Ellwood City v. Pa. Labor Relations Bd.*, 998 A.2d 589, 594 (Pa. 2010). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lancaster County*, 124 A.3d at 1286 (citation omitted). It "is more than a mere scintilla and must do more than create a suspicion of the existence of the fact to be established." *Id.* (citation omitted). The existence of evidence to support contrary findings does

14

not mean the actual findings are not supported by substantial evidence. *Am. Fed'n of State, Cty. & Mun. Emps., Dist. Council 87 v. Pa. Labor Relations Bd.*, 77 A.3d 53, 59 (Pa. Cmwlth. 2013). So long as the Board's findings are supported by substantial evidence and its legal conclusions "drawn from those facts are reasonable, not capricious, arbitrary, or illegal," the Board's decision should be upheld. *Lancaster County*, 124 A.3d at 1286. Moreover, it is within the Board's province to resolve conflicts in evidence, make credibility determinations,[6] resolve factual questions and draw inferences from those facts. *City of Reading v. Pa. Labor Relations Bd.*, 568 A.2d 715, 718 (Pa. Cmwlth. 1989).

With the above principles in mind, we turn to the issues raised by Union.

### A.    *Unfair Labor Practice under Section 1201(a)(3)*

Section 1201(a)(3) of PERA prohibits public employers from "[d]iscriminating in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any employe organization." 43 P.S. § 1101.1201(a)(3). Union, as the party asserting an unfair labor practice, bears the burden of proving CamTran violated this subsection. *Perry County v. Pa. Labor Relations Bd.*, 634 A.2d 808, 810-11 (Pa. Cmwlth. 1993). To prove an unfair labor practice, Union must show, "by a preponderance of the evidence, that: (1) the employee was engaged in protected activity; (2) the employer knew of the activity; and (3) the employer was motivated by an unlawful motive or anti-union animus in taking adverse action against the employee." *Lancaster County*, 124 A.3d at 1286. If Union establishes a prima facie case, "the burden then shifts to the employer to establish, by a preponderance of the evidence,

---

[6] Here, the Board accepted the Hearing Examiner's findings as its own.

15

that the employee would have been discharged even in the absence of . . . union activities." *Lehighton Area Sch. Dist. v. Pa. Labor Relations Bd.*, 682 A.2d 439, 443 (Pa. Cmwlth. 1996).

Here, the first two elements are not at issue. The Board found and the parties do not dispute that Zibura engaged in protected activity and that CamTran had knowledge of at least some of those activities. Therefore, our inquiry is limited to whether CamTran acted with an unlawful motive or with anti-union animus when it disciplined Zibura. An employer's motive may be inferred based on its actions. *Lancaster County*, 124 A.3d at 1289. Motive should be determined based on an examination of the record as a whole. *Id.* Factors to be considered include the credibility of the employer's stated reasons for discipline, the timing of the discipline in relation to the protected activity, the nature of the employer's investigation, the employer's treatment of similarly situated employees, and the employer's application of progressive discipline. *Id.* at 1289-90.

Here, the Hearing Examiner examined those factors and concluded that they "weigh heavily against an inference of anti-union animus." (Proposed Decision and Order at 6-7.) The Hearing Examiner credited the testimony of HR Manager, Director of Facilities, and Executive Director, that the reason for their recommendation or decision, in the case of Executive Director, was the knife incident involving Zibura and HR Assistant. (*Id.* at 7.) Moreover, they each testified that their investigation was in accordance with how they conducted all other investigations involving employees, and they did not consider Zibura's Union activities. (R.R. at 317a, 333a, 365a, 380a-81a.) It also does not appear as though CamTran rushed to judgment. Upon receiving HR Assistant's incident report, HR Manager and Director of Facilities interviewed Union President and the

16

other driver, both of whom were present in the breakroom. (R.R. at 320a, 361a; CamTran Exs. 5 & 6, R.R. at 546a-51a.) They also interviewed Zibura herself to obtain her version of events. (R.R. at 321a-22a; CamTran Ex. 7, R.R. at 553a-56a.) After HR Manager and Director of Facilities recommended Zibura's termination, Executive Director did not simply act on their recommendation but met with Zibura a second time to hear firsthand Zibura's version of events. (R.R. at 325a, 378a, 382a.) Only then did she decide to terminate Zibura for violation of the weapons policy. Union points to the three-day delay in removing Zibura from her route as evidence that the incident was not serious. However, this argument ignores that the incident occurred on a Friday afternoon and by the time HR Assistant returned to the main office and completed her incident report, Zibura's shift was over or nearing completion. (*Id.* at 335a, 361a.) While Zibura began her shift the following Monday at 6 a.m., when office personnel reported to work later that morning, they promptly pulled her from her route and directed her to meet with them at the main office. In addition, CamTran's weapons policy called for discharge for the first offense, which is what CamTran followed. (CamTran Ex. 2, R.R. at 533a.) Based on the credited testimony, we cannot find that the Board erred in not inferring anti-union animus from CamTran's failure to resort to progressive discipline.

Although Union offered conflicting evidence, the Hearing Examiner was the factfinder responsible for resolving conflicts in evidence and making credibility determinations. *City of Reading*, 568 A.2d at 718. We cannot overturn those findings on appeal unless they are not supported by substantial evidence. As discussed above, the record evidence here supports these findings. Although Union presented contrary evidence, this does not mean there was not substantial

17

evidence to support the findings of the Hearing Examiner. *Am. Fed'n of State, Cty. & Mun. Emps., Dist. Council 87*, 77 A.3d at 59. Therefore, we cannot conclude the Hearing Examiner erred in refusing to infer anti-union animus.

Nor can we conclude that the Hearing Examiner was required to find discriminatory animus as a matter of law based upon the temporal proximity between the discipline and the protected activity. Union is correct that timing is important, but it is not determinative. It is but one factor to be considered. The Hearing Examiner considered the timing of the protected activity and Zibura's discharge and decided it was too remote to be given much weight, especially when the record as a whole was considered. (Proposed Decision and Order at 7.) Although the Board in *Lancaster County* found anti-union animus could be inferred from the timing of the employees' protected activity and their discharge, it did so in conjunction with other factors, such as the nature of the employer's investigation and the disparate treatment of other employees, which is not present here. 124 A.3d at 1289-90.

Union also argued anti-union animus could be inferred from the disparate treatment of Zibura and the other drivers who were involved in an altercation. "Disparate treatment has previously been recognized in discrimination cases as a valid way of demonstrating an improper bias provided the circumstances of the employees who are compared with the complainant are sufficiently similar." *City of Reading*, 568 A.2d at 719. Here, as the Hearing Examiner noted, the incident involving Zibura and the altercation involving the other drivers are not sufficiently similar. The retired driver who was involved in the other altercation testified it was a verbal altercation involving yelling and screaming. (R.R. at 295a-96a.) Here, the incident involved a knife. Under CamTran's weapons policy, the knife

was a weapon because it was not being used for its intended purpose, i.e. cutting food. (CamTran Ex. 2, R.R. at 533a.) Therefore, the two incidents are not sufficiently similar in nature to infer disparate treatment.

Based upon the credited evidence as found by the Hearing Examiner, Union did not meet its burden of showing CamTran acted with anti-union animus when it discharged Zibura following the knife incident. Moreover, upon review of the record, those findings are supported by substantial evidence. Accordingly, we affirm the Board's Final Order dismissing this claim.

### B. Unfair Labor Practice under Section 1201(a)(2)

Section 1201(a)(2) prohibits a public employer from "[d]ominating or interfering with the formation, existence or administration of any employe organization." 43 P.S. § 1101.1201(a)(2). The Board found CamTran did not violate this subsection of the PERA because there was no allegation or evidence that CamTran tried to prevent Union "from becoming so controlled or assisted by [CamTran] that [Union] is indistinguishable from [CamTran]." (Final Order at 9.) Union's allegations, the Board found, properly fell under other subsections of Section 1201(a), such as subsection (3) or (5). (*Id.*) Union claims this was error because the plain language of Section 1201(a)(2) provides that it is unlawful to "interfere[e] with the . . . administration of any employe organization." (Union Br. at 35 (citing 43 P.S. § 1101.1201(a)(2)).)

For issues involving statutory interpretation, which are legal questions, the Pennsylvania Supreme Court has stated:

> [A]n administrative agency's interpretation [of a statute] is to be given controlling weight unless clearly erroneous. However, when an administrative agency's interpretation is inconsistent with the statute

19

itself, or when the statute is unambiguous, such administrative interpretation carries little weight. Appreciating the competence and knowledge an agency possesses in its relevant field, our Court [has] opined that an appellate court will not lightly substitute its judgment for that of a body selected for its expertise whose experience and expertise make it better qualified than a court of law to weigh facts within its field. Moreover, we have emphasized that this high level of deference is especially significant in the complex area of labor relations.

*Lancaster County*, 124 A.3d at 1286 (citations and quotations omitted).

We acknowledge that there is a dearth of case law interpreting Section 1201(a)(2).[7] However, we need not determine whether the Board's interpretation of Section 1201(a)(2) is correct because, based upon the factual findings of the Hearing Examiner, Union has not demonstrated that CamTran "interfer[ed] with the . . . administration of [Union]." 43 P.S. § 1101.1201(a)(2). As the Board noted, "[c]laims that an employer terminated an employe because of the employe's

---

[7] "When there are no Pennsylvania cases on point, we have been encouraged by the Supreme Court of Pennsylvania to follow the [National Labor Relations Board] cases interpreting provisions of the [National Labor Relations Act, 29 U.S.C. §§ 151-169] similar to the PERA." *Commonwealth v. Pa. Labor Relations Bd.*, 826 A.2d 932, 934 (Pa. Cmwlth. 2003). Both Section 6(1)(b) of the Pennsylvania Labor Relations Act, Act of June 1, 1937, P.L. 1168, *as amended*, 43 P.S. § 211.6(1)(b), and Section 8(a)(2) of the National Labor Relations Act, 29 U.S.C. § 158(a)(2), provide that it is "an unfair labor practice for an employer . . . to dominate or interfere with the formation or administration of any labor organization or contribute financial or other" forms of support to it. There is also a dearth of case law involving those provisions. However, we note that Board decisions involving Section 1201(a)(2) have been limited to those involving company unions. *See, e.g.*, *Conrad Weiser Educ. Ass'n v. Conrad Weiser Area Sch. Dist.*, 46 PPER ¶ 59 (2014) (explaining that to show a violation of this subsection, the union must demonstrate "that the employer is interfering or dominating the union by placing managerial employes in the hierarchy of the union or by providing financial or other aid to the union to the point that the union is controlled by the employer and no[] longer represents the wishes of the employees."); *Nat'l Conference of Firemen & Oilers Local 473 v. Phila. Hous. Auth.*, 33 PPER ¶ 33061 (2002) (explaining that like its federal counterpart, Section 1201(a)(2) "prohibit[s] the formation of company unions").

20

involvement in collective bargaining" would fall under Section 1201(a)(3), (Board's Br. at 28), and, as discussed above, we have affirmed that there was no violation of that subsection. Therefore, these allegations cannot support a claim under Section 1201(a)(2) either.

Moreover, there is no evidence of interference, generally. As the Hearing Examiner found, Zibura's discharge was independent of her or Union's activities. The Hearing Examiner credited HR Manager who testified she terminated Zibura for violating CamTran's weapons policy. The Hearing Examiner found this was sufficient to justify CamTran's actions. Similar to Section 1201(a)(1), which deals with interfering with an employee's rights, an employer cannot be charged with interfering with a union under Section 1201(a)(2) if there is a legitimate basis for its actions. Otherwise, employers would be subject to an unfair labor practice claim every time it took any adverse action against a union officer, even if that action would otherwise be justified.

Because the record is devoid of credited evidence that CamTran interfered with Union's existence or administration, Union's claim under Section 1201(a)(2) does not succeed.


### C. Unfair Labor Practice under Section 1201(a)(1)

Section 1201(a)(1) prohibits a public employer from "[i]nterfering, restraining or coercing employes in the exercise of the rights guaranteed in [Section 401 of the PERA, 43 P.S. § 1101.401]." 43 P.S. § 1101.1201(a)(1). Section 401, in turn, provides:

> It shall be lawful for public employes to organize, form, join or assist
> in employe organizations or to engage in lawful concerted activities
> for the purpose of collective bargaining or other mutual aid and

21

protection or to bargain collectively through representatives of their own free choice and such employes shall also have the right to refrain from any or all such activities, except as may be required pursuant to a maintenance of membership provision in a collective bargaining agreement.

43 P.S. § 1101.401.

A violation of this subsection can be either independent or derivative. A violation of another subsection would be sufficient to establish a derivative violation of Section 1201(a)(1). *Lancaster County*, 124 A.3d at 1277 n.3. In other words, if Section 1201(a)(2)-(9) were violated, Section 1201(a)(1) is also violated.

Alternatively, "[a]n independent violation occurs when an employer engages in conduct that tends to interfere, restrain, or coerce reasonable employees in the exercise of their rights under" Section 401 of PERA. *Elliott v. Pa. Labor Relations Bd.* (Pa. Cmwlth., No. 588 C.D. 2016, filed March 2, 2017), slip op. at 9.[8] The Board has found an independent violation when "the actions of the employer, in light of the circumstances in which the particular act occurred, tend to be coercive, regardless of whether employes have been shown, in fact, to have been coerced." *Faculty Fed'n of the Cmty. Coll. of Phila., Local 2026 v. Cmty. Coll. of Phila.*, 20 PPER ¶ 20194 (1989). Once a prima facie case is established, the burden shifts to the employer to show "it had a legitimate reason for the action it took and that the need for this action justified any interference with the employees' exercise of their statutory rights." *Id.* A balancing test is then applied, where the employer's need to act for legitimate reasons is weighed against the employees' statutory rights. *Id.*

---

[8] *Elliott* is an unreported panel decision of this Court, which is cited in accordance with Section 414(a) of this Court's Internal Operating Procedures, which provides that an unreported panel decision issued by this Court after January 15, 2008, may be cited "for its persuasive value, but not as binding precedent." 210 Pa. Code § 69.414(a).

22

As stated above, Union has not established that CamTran violated Section 1201(a)(2) or (3) of the PERA. Therefore, it cannot establish a derivative violation of Section 1201(a)(1). *Lancaster County*, 124 A.3d at 1277 n.3. Based upon the findings of fact and credibility determinations made by the Hearing Examiner and adopted by the Board, Union also cannot establish an independent violation of Section 1201(a)(1). Here, the Board determined Zibura was terminated because of her violation of the weapons policy. We cannot find that this would tend to interfere with or coerce employees from engaging in protected activity. Employers have a duty to provide a safe work environment for their employees. CamTran had a legitimate reason for taking action against Zibura for violating the weapons policy. *See Pittston Area Sch. Dist.*, 27 PPER ¶ 27066 (1996) (finding disciplinary action for defying "employer's instructions[] does not have a tendency to coerce" employees because "no policy of PERA would be served if the acts of insubordination were sheltered under the protection of the right of employes to engage in lawful union activity").

Union repeatedly argues the incident "amounts to a very minor offense" or if it was misconduct, it was "a minor, trivial offense." (Union's Br. at 31-32.) This characterization, however, ignores the Hearing Examiner's findings. We reiterate, the Hearing Examiner is the ultimate factfinder, responsible for resolving conflicts in evidence and making credibility determinations. *City of Reading*, 568 A.2d at 718. The Hearing Examiner's findings here were in favor of CamTran. As such, we cannot find the Board erred in dismissing Union's claim under Section 1201(a)(1).

## IV. Conclusion

Union argues the Board erred in dismissing its claims of unfair labor practices against CamTran, but, in reality, Union is challenging the Board's credibility determinations and how it resolved conflicts in evidence. It is well established, however, that those issues are solely within the province of the factfinder. *City of Reading*, 568 A.2d at 718. Because we cannot disturb the Hearing Examiner's findings, which were adopted by the Board, and those findings are supported by substantial evidence, we affirm the Board's Final Order.

                                                    _____

**RENÉE COHN JUBELIRER**, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Amalgamated Transit Union Local 1279, : 
                      Petitioner : 

                        : 

                v. :    No. 1134 C.D. 2018

                        : 

Pennsylvania Labor Relations Board, : 
                    Respondent : 

# **O R D E R**

     **NOW**, April 30, 2019, the Final Order of the Pennsylvania Labor Relations Board dated July 17, 2018, is **AFFIRMED.**

                              _____

                              **RENÉE COHN JUBELIRER,** Judge